*230
 
 THOMAS, Judge.
 

 This appeal concerns the validity of an amendment to a restrictive covenant governing the minimum square footage of single-family homes in a residential subdivision. The essential facts are undisputed.
 

 Miller’s Landing, L.L.C. (“the company”), is an Alabama limited liability company with four members — three physicians and a trust. Each member owns 25% of the company. The physicians are Dr. Christopher Miller, Dr. James A. Robeson, and Dr. J. Ryan Conner, who practice together in a medical partnership located in Dothan. The trust is the Miller Real Estate Trust (“the trust”), which was established by Christopher Scott Miller (hereinafter referred to as “Scott Miller” in order to differentiate him from Dr. Chris Miller), with Scott Miller’s father-in-law, Gary Anderson, designated as the trustee.
 

 The trust and the physicians each invested $55,000 in the company, and the company then purchased 41 acres of real property in Dale County for the purpose of developing a subdivision called “Bethlehem Fields.” Scott Miller and the investors planned to build their own homes on lots in the subdivision, and they planned to offer the remaining lots for sale to the public through the company. Scott Miller and each individual investor chose a building lot. On September 8, 2004, the company recorded its subdivision plat in the Dale Probate Court. The plat shows 18 lots ranging in size from slightly larger than 1 acre to slightly larger than 2½ acres. A notation on the plat states that the “[m]ini-mum house size for each lot is 3,500 square feet.”
 

 On September 30, 2004, Scott Miller recorded a deed conveying Lot 9 of the subdivision, comprising 2.45 acres, to him and his wife, Mary J. Miller. Shortly thereafter, Scott and Mary Miller began constructing a 7,500-square-foot home on the lot. According to Scott Miller, Dr. Chris Miller was supposed to have been the next to build in the subdivision, but, he said, Dr. Miller decided not to build his home until some of the available lots had been sold to the public so that he could use the sales proceeds to defray the construction costs on his own home.
 

 On November 19, 2004, the company filed subdivision restrictions setting forth, among other things, a minimum building size of 3,500 square feet for each house in the subdivision. There was no provision for amending the subdivision restrictions. On August 10, 2005, the company filed a second set of subdivision restrictions, reducing the minimum building size and linking it to the size of the lots in the subdivision. A house built on a lot smaller than 1.4 acres was to have no less than 3,000 square feet; a house built on a lot larger than 1.4 acres but smaller than 2 acres was to have no less than 3,200 square feet; and a house built on a lot of 2 or more acres was to have no less than 3,400 square feet. Scott Miller consented to the second set of restrictions. Those restrictions also contained no provision for further amendment.
 

 On June 13, 2006, the four members of the company executed a third set of subdivision restrictions, leaving intact the previous square-footage requirements but providing, for the first time, a procedure for amending the restrictions: § E~8 provided that the “covenants and restrictions may be amended by an instrument executed by 75% of the property owners recorded in the public records of Dale County ....” At that time, the company and Scott and Mary Miller were the owners of all the lots in the subdivision. Dr, Chris Miller had not built a house in the subdivision, and one of the other physician members of the company had purchased a house in another
 
 *231
 
 neighborhood. The evidence indicated that the company’s real-estate agent had been suggesting for some time that the company consider reducing the square-footage requirement of the building restrictions because, the agent said, although she had received a number of inquiries concerning the lots, potential buyers lost interest in buying when they were made aware of the building restrictions.
 

 The third set of restrictions was filed in the Dale Probate Court on June 21, 2006. On June 29, 2006, Gary Anderson recorded a warranty deed conveying Lot 10 in the subdivision to him and his wife, Patricia Anderson. The Andersons’ lot is adjacent to the lot owned by Scott and Mary Miller.
 

 On March 20, 2007, the property owners held a meeting to discuss an amendment to the subdivision restrictions. At that time, 16 of 18 lots were owned by the company, 1 lot was owned by Scott and Mary Miller, and 1 lot was owned the Andersons. The owners voted to amend the building requirement to reflect that a house built on a lot of 2 or more acres was to have no less than 2,500 square feet and that a house built on a lot smaller than 2 acres was to have no less than 2,300 square feet. The company cast 16 votes, or 88.8% of the eligible votes, in favor of the amendment; the Andersons cast 1 vote against the amendment; and Scott and Mary Miller neither attended the meeting nor voted on the amendment. The evidence was undisputed that Scott and Mary Miller had been given proper notice of the time, place, and purpose of the property owners’ meeting. The amended restrictions were filed in the Dale Probate Court on April 27, 2007.
 

 On June 19, 2007, Scott and Mary Miller and the Andersons sued the company, the physicians, and SunSouth Bank, alleging fraud and breach-of-contract claims and seeking a judgment declaring that the last amended subdivision restrictions were null, void, and unenforceable. The company and the physicians answered and counterclaimed, alleging fraud and breach-of-contract claims, and also filed a third-party breach-of-contract action against the trust. Before trial, the parties stipulated that SunSouth Bank had been joined as a party only because it was the holder of the mortgage on the lots in the subdivision, that it had consented to the amended subdivision restrictions, and that it would not participate in the trial. The witnesses at trial included Scott Miller, Gary Anderson, Craig Griffin, a local real-estate developer, Dr. Miller, Dr. Miller’s wife, and Dr. Robeson.
 

 Scott Miller testified that he and the physicians had originally envisioned Bethlehem Fields as an exclusive, gated community where they would build their own homes and from which they would make a profit by selling lots to the public. He stated that, in his opinion, the square-footage reduction in the building requirements would result in diminishing the value of his house and altering the general scheme or plan of development of the subdivision. He concluded that, once the physicians had decided not to build their own homes in the subdivision, their motivation had become solely profit-driven, and, thus, he said, they were determined to reduce the square-footage requirement in order to make the subdivision more marketable to the general public without considering the impact upon the character of the neighborhood. Scott Miller acknowledged that he had signed the resolution agreeing to the amendment procedure outlined in § E-8, but, he said, he was under the impression that amendments were to be used only for purposes of effecting “cosmetic” changes, such as “flowers and stuff’ to the subdivision restrictions.
 

 Craig Griffin, the developer of the Griffin Gate subdivision, which is located
 
 *232
 
 across the street from the Bethlehem Fields subdivision, testified that the average lot size in his subdivision is one acre, but some of the lots are larger than two acres. Griffin stated that he had sold half the lots in his subdivision, which has a minimum building requirement of 3,000 square feet for all houses. Griffin opined that reducing the square-footage requirement for houses built in the Bethlehem Fields subdivision would adversely affect the value of the homes owned by Scott and Mary Miller and the Andersons and would “change the general scheme of development of the subdivision.”
 

 Dr. Chris Miller conceded that reducing the square-footage requirement was an attempt to boost the sales of lots in the subdivision. He also conceded that reducing the size of the houses that could be built on the lots in the subdivision could, at some point, change the general scheme or plan of development of the subdivision, but, he said, he did not think that point had been reached by allowing 2,300- and 2.500-square-foot houses. Further, he opined that the character of a subdivision is determined by factors other than the size of the houses in the subdivision. Dr. Miller testified that, although the initial subdivision restrictions had specified a 3.500-square-foot minimum building requirement, no one had ever represented to Scott Miller that that requirement would endure “forever.” He explained that the development plan was a “moving target,” in that the company was trying to find what worked for the buying public as well as what would result in a successful business plan for the members of the company. He said that no one, including Scott Miller, would profit if 16 of 18 subdivision lots remained unsold.
 

 The parties filed posttrial briefs, after which the circuit court entered a judgment on July 1, 2008, in favor of all defendants on the plaintiffs’ claims. The circuit court also adjudicated the counterclaims and the third-party claim; none of the issues underlying those claims are raised on appeal. Scott and Mary Miller and the Andersons timely appealed to the Alabama Supreme Court. The supreme court transferred the case to this court pursuant to § 12-2-7(6), Ala.Code 1975.
 

 On appeal, Scott and Mary Miller and the Andersons raise one issue: whether “the reductions in the minimum square footage requirements by the developer of Bethlehem Fields subdivision [were] reasonable and consistent with the general scheme or plan of development of the subdivision.” On that issue, the circuit court’s judgment determined the following:
 

 “Plaintiffs rely upon the case of
 
 Wright v. Cypress Shores Dev. Co.,
 
 413 So.2d 1115 (Ala.1982), for the proposition that restrictive covenants may not be amended unless the amendment is reasonable and is not inconsistent with or does not destroy the general scheme or plan of development. The court finds this to be the law in Alabama at this time.
 

 “Is the amendment reasonable? Is it based upon good, logical reason or does it appear to be arbitrary and capricious? The court finds that there was good, logical reason for the amendment. The lots were not selling. Potential profit or the possibility of breaking even was in increasing jeopardy due to increasing interest payments. Potential buyers had requested permission to build homes with smaller square footages and a listing real estate agent seemed to be of the opinion that a reduction in the minimum square footage would potentially increase sales. It is no mystery that the market of potential buyers would be increased by a reduction in the cost of construction. It is also reasonable to infer that, if lots do not sell and
 
 *233
 
 houses are not built, then the value of Plaintiffs’ investments would decline. Perhaps as much or more so than from the construction of smaller homes in the subdivision. The court finds that the action taken in amending the restrictive covenants and reducing the minimum square footage was not arbitrary or capricious or done on a whim, but was based on sound reason. The court further finds that the amendment to restrictive covenants contained in § E-8 of the Covenants and Restrictions for Bethlehem Fields Subdivision, recorded June 21, 2006, was a valid amendment.
 

 “Under that amendment more than 75% of the property owners of the subdivision found there to be good reason to approve the amendment in question. Is the amendment in question inconsistent with the general scheme or plan of development? ....
 

 “.... Neither the phrase ‘general plan or scheme of development’ nor the word ‘general’ is defined in the restrictive covenants in question. Furthermore, the court has been unable to find any legal definition assigned to the same. Therefore, the court finds that Defendants’ suggestion of considering the ordinary meaning of this phrase or word to be well taken. Defendants note the
 
 Webster’s Collegiate Dictionary, Tenth Edition,
 
 definition of the word ‘general’ to be ‘concerned or dealing with universal rather than particular aspects.’ The court also finds in that same publication the definition of ‘relating to, determined by, or concerned with main elements rather than limited details.’ The court further accepts Defendants’ definitions of the words ‘plan’ and ‘scheme.’
 

 “Is the general plan and scheme of the development to create a residential subdivision or does the general plan and scheme include all of the specific restrictions contained in the restrictive covenants? If the general plan and scheme is something other than ‘residential development,’ the court must subjectively interpret from the evidence all that the general plan and scheme includes. The court recognizes from the
 
 Wright
 
 decision that the amendment allowing modification of the restrictive covenants by a 75% vote is not unlimited. However, in citing
 
 Schmidt [v. Ladner Construction Co.,
 
 370 So.2d 970 (Ala.1979) ], the
 
 Wright
 
 court stated, ‘[m]ore importantly, however, the proposed modifications under scrutiny in
 
 [Schmidt
 
 ] neither annulled,
 
 nor were inconsistent with, the general scheme or plan of development for the subdivision or its residential use purpose.’
 
 (Emphasis added.) In
 
 Schmidt
 
 the proposed amendment was to reduce the ground floor area for a one-story dwelling from 1400 to 1200 square feet.
 

 “By interpreting the phrase ‘general plan and scheme’ as it applies to the restrictive covenants in question using the ordinary meaning of the words ‘general,’ ‘plan’ and ‘scheme’ by definition as previously cited, the court finds that the general plan and scheme is residential development and that the myriad restrictions contained in the document are specifics with regard to that general plan and scheme. The reduction of the minimum square footages of the residences provided in the amendment in issue here is not inconsistent with the general plan and scheme of a residential development.”
 

 Standard of Review
 

 Because the essential facts are undisputed and only a question of law is presented with respect to whether the amended restrictive covenant is valid, our review is de novo.
 
 See Poffenbarger v. Merit Energy
 
 
 *234
 

 Co.,
 
 972 So.2d 792, 795 (Ala.2007) (citing
 
 Christian v. Murray,
 
 915 So.2d 23, 25 (Ala.2005)).
 

 The Parties’ Arguments
 

 Scott and Mary Miller and the Andersons argue that the April 27, 2007, amendment reducing the minimum area of a house that can be built on the larger lots in the subdivision from 3,400 square feet to 2,500 square feet and reducing the minimum area of a house that can be built on the smaller lots in the subdivision from 3,000 square feet to 2,300 square feet was invalid. Relying solely on
 
 Wright v. Cypress Shores Development Co.,
 
 413 So.2d 1115 (Ala.1982), they argue that the amendment was unreasonable and inconsistent with the general scheme or plan of development of the subdivision.
 

 In
 
 Wright,
 
 the developer of a subdivision with a “residential-only” restrictive covenant had reserved the right to amend, through its Architectural Control Committee, the restrictive covenants applicable to the subdivision. When the Committee approved the building of a convenience store on two of the lots in the subdivision, the property owners sought declaratory relief. The trial court denied relief, and the property owners appealed to the Alabama Supreme Court.
 

 Citing its earlier decision in
 
 Hall v. Gulledge,
 
 274 Ala. 105, 145 So.2d 794 (1962), and the Florida decision of
 
 Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.,
 
 303 So.2d 665, 666 (Fla.Dist.Ct.App.1974), our supreme court held that the developer of a subdivision may reserve the right to unilaterally “annul, cancel, amend or modify the restrictive covenants” applicable to a subdivision so long as the developer exercises that right “in a reasonable manner consistent with [the] general scheme or plan of development” of the subdivision.
 
 Wright,
 
 413 So.2d at 1124. The court decided that canceling the restriction so as to permit the construction of a convenience store in a residential subdivision was “an unreasonable exercise of the Committee’s authority and highly inconsistent with the general scheme or plan of development upon which [the property owners had] relied when purchasing their lots.”
 
 Id.
 

 Scott and Mary Miller and the Andersons argue that, although the trial court purported to apply
 
 Wright
 
 when it held that the amendment did not violate the reasonableness/plan-of-development test, the trial court misconstrued the test. They contend that the trial court’s interpretation of the “reasonableness” prong of the test was erroneous because in determining i*easonableness, they say, the question is not whether one can assign a logical reason for amending a building requirement, but whether the substance of the amendment is reasonable. They also maintain that the trial court misconstrued the phrase “general scheme or plan of development” to encompass only the overall residential-use
 
 pw)"pose
 
 of the subdivision without considering the specific
 
 character
 
 of the subdivision.
 

 The company and the physicians first argue that
 
 Wright
 
 is distinguishable and, therefore, that the reasonableness/plan-of-development test does not even apply to the amendment at issue here. They point out that
 
 Wright
 
 was decided in the context of a right reserved
 
 by the developer
 
 to unilaterally amend the restrictions, whereas in this case the amendment was voted upon and agreed to by 75% of the
 
 property owners,
 
 all of whom had previously approved the amendment procedure. The company and the physicians maintain that there is no indication in
 
 Wright
 
 that the reasonableness/plan-of-development test applies when the amendment of a restrictive covenant results from a vote of the property owners.
 
 *235
 
 In the alternative, they argue that, if the reasonableness/plan-of-development test is applicable, then the trial court correctly applied the test to the facts before it.
 

 Analysis
 

 Section E-8 of the governing documents for the subdivision provides that “covenants and restrictions may be amended by an instrument executed by 75% of the property owners recorded in the public records of Dale County .... ” Because the company, as the developer of the subdivision, owned all the unsold lots, and only 2 of the 18 lots had been sold on March 20, 2007, when the vote on the amendment was taken, it was the developer who determined the outcome of the vote.
 

 Under the circumstances, it is somewhat disingenuous to argue that
 
 Wright
 
 has no application to this case because it dealt with an amendment made unilaterally by a developer, rather than an amendment approved by a vote of the property owners. In the present case, the company did not engage in a sham or artifice that allowed it to unilaterally amend the building-requirement restriction.
 
 Compare Rocky Ridge Ranch Prop. Owners Ass’n v. Areaco Investment Co.,
 
 993 S.W.2d 553, 555 (Mo.Ct.App.1999) (invalidating an amendment approved by 2/3 of the subdivision property owners because developer, who owned only one-half the lots .in the subdivision between 1976 and 1994, platted an additional 1150 lots in 1994, when the vote on the amendment was taken, thus allowing it to “unilaterally execute” an amendment to the restriction). Nevertheless, the company was able to control the outcome of the vote on the amendment because its 16 votes accounted for 88.8% of the total votes.
 

 We conclude that the reasonableness/plan-of-development test announced in
 
 Wright
 
 is applicable here because the decision to amend the restriction in this case was, for all practical purposes, made by the developer. However, even if
 
 Wright
 
 is not strictly applicable to the facts before us, the test to determine the validity of the amendment — and the result — is the same.
 

 Although Alabama courts have not decided the issue, the majority of courts in other jurisdictions that have considered the question have held that the power to amend a restrictive covenant by a vote of less than 100% of the property owners in a subdivision is subject to a “reasonableness” standard,
 
 see, e.g., Mulligan v. Panther Valley Prop. Owners Ass’n,
 
 337 N.J.Super. 293, 302, 766 A.2d 1186, 1191 (2001) (noting that the majority of jurisdictions employ the reasonableness standard);
 
 Armstrong v. Ledges Homeowners Ass’n,
 
 360 N.C. 547, 559 n. 2, 633 S.E.2d 78, 87 n. 2 (2006) (collecting cases), and many courts further require that the amendment be consistent with the general plan of the development,
 
 see Bay Island Towers, Inc. v. Bay Island-Siesta Ass’n,
 
 316 So.2d 574, 575 (Fla.Dist.Ct.App.1975);
 
 Harrison v. Air Park Estates Zoning Comm.,
 
 533 S.W.2d 108, 111 (Tex.Civ.App.1976);
 
 Shafer v. Board of Trs. of Sandy Hook Yacht Club Estates, Inc.,
 
 76 Wash.App. 267, 273-74, 883 P.2d 1387, 1392 (1994) (quoting
 
 Lakemoor Cmty. Club, Inc. v. Swanson,
 
 24 Wash.App. 10, 15, 600 P.2d 1022, 1025 (1979), quoting in turn
 
 Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.,
 
 303 So.2d at 666, the Florida decision upon which our supreme court relied in Wright).
 

 In
 
 Armstrong v. Ledges Homeowners Ass’n,
 
 supra, the Supreme Court of North Carolina rejected the argument that
 
 “any
 
 amendment that is adopted in accordance with association by-laws and is neither illegal nor against public policy is valid and enforceable, regardless of its breadth or
 
 *236
 
 subject matter.” 360 N.C. at 559, 633 S.E.2d at 87. The court held, instead, that “a provision authorizing a homeowners’ association to amend a declaration of covenants does not permit amendments of unlimited scope; rather, every amendment must be
 
 reasonable
 
 in light of the contracting parties’ intent.”
 
 Id.
 

 Our conclusion that the reasonableness/plan-of-development test applies even to an amendment that results from a vote of the property owners is strengthened by reference to the provisions of the
 
 Restatement (Third) of Property: Servitudes
 
 (2000). Based on the
 
 Restatement
 
 definitions, the Bethlehem Fields subdivision is a “common-interest community,”
 
 see Restatement
 
 § 1.8, and its restrictive covenants are “servitudes,”
 
 see Restatement
 
 § 1.1 and § 1.3(3). Section 6.13 of the
 
 Restatement
 
 enumerates the duties of a common-interest community to its members, including the duty “to act reasonably in the exercise of its discretionary powers, including rulemaking, enforcement, and design-control powers.” The duty to act reasonably also applies to the power to amend the declaration, or governing documents, of a common-interest community.
 
 See Restatement
 
 § 6.10 at 200 (Comment f).
 

 Having determined that the reasonableness/plan-of-development test applies to the amendment at issue in the present case, we now review the trial court’s determination that the test was satisfied.
 

 Reasonableness
 

 The following statement by the Washington Court of Appeals represents a concise synthesis of the factors that courts have examined in order to determine whether an amendment to a restrictive covenant is reasonable: “In assessing what constitutes ‘a reasonable manner consistent with the general plan of the development,’ we look to the language of the covenants, their apparent import, and the surrounding facts.”
 
 Meresse v. Stelma,
 
 100 Wash.App. 857, 865, 999 P.2d 1267, 1273 (2000). “Surrounding facts” include:
 

 (1) whether the amendment was enacted in compliance with the procedural requirements of the governing documents of the subdivision,
 
 see Windom v. Easley,
 
 495 So.2d 46, 47-48 (Ala.1986) (stating that “[i]f the amendments were fraudulently obtained and proof of this fact was made, then the plaintiff was entitled to have the original covenants ... enforced; however, there is nothing in the record which indicates that the signatures in support of the amendment were falsified or obtained by fraud, and we must conclude that the trial judge found that they were not”);
 
 Dauphin Island Prop. Owners Ass’n, v. Kuppersmith,
 
 371 So.2d 31 (Ala.1979) (holding that a petition signed by a majority of property owners to amend a restriction did not comply with the formal amendment procedure set out in the governing documents of the association);
 

 (2) whether the amendment was enacted in a reasonable manner,
 
 e.g.,
 
 whether the majority of owners acted with due regard for the rights of minority owners,
 
 see Meresse v. Stelma,
 
 100 Wash.App. at 867, 999 P.2d at 1274 (invalidating an amendment voted by the majority of owners that relocated the subdivision access road onto a minority owner’s property; the court concluded that the majority, by characterizing its action as “ ‘maintenance, repairs,’ or ‘additional construction on the road’ ” — an action that did not require unanimous approval under the governing documents of the subdivision — had attempted to evade the unanimity requirement); and
 

 (3) whether the amendment represents a good-faith attempt to adapt to changing circumstances,
 
 see Matthews v. Kernewood, Inc.,
 
 184 Md. 297, 40 A.2d 522 (Ct.
 
 *237
 
 App.1945);
 
 Restatement (Third) of Property: Servitudes
 
 § 6.10, Comment a at 196 (stating that “[t]he power to amend the governing documents in a common-interest community prevents a small number of holdouts from blocking changes regarded by the majority to be necessary to adapt to changing circumstances and thereby permit the community to retain its vitality over time”).
 

 The trial court’s judgment reflects that it considered the foregoing factors. The court first inquired whether the amendment was based on “a good, logical reason” or whether it appeared to be “arbitrary and capricious.” Although Scott and Mary Miller and the Andersons take issue with the trial court’s question, contending that it indicates that the court misconstrued the focus of the reasonableness inquiry, we conclude that the trial court’s question was appropriate and that it is Scott and Mary Miller and the Andersons who have misconstrued the focus of the inquiry.
 
 See Armstrong v. Ledges Homeowners Ass’n,
 
 360 N.C. at 559 n. 2, 633 S.E.2d at 87 n. 2, citing:
 

 “Hutchens v. Bella Vista Vill. Prop. Owners’ Ass’n,
 
 82 Ark.App. 28, 37, 110 S.W.3d 325, 330 (2003) (concluding ‘the power of ... [a] homeowner’s [sic] association ... to make rules, regulations, or amendments to its declaration or bylaws is limited by a determination of
 
 whether the action is unreasonable, arbitrary, capricious, or discriminatory
 
 ’);
 
 Buckingham v. Weston Vill. Homeowners Ass’n,
 
 1997 ND 237, ¶ 10, 571 N.W.2d 842, 844 (A condominium association’s amendment to the declaration or bylaws ‘must be reasonable’ and
 
 ‘a rule which is unreasonable, arbitrary, or capricious is invalid.’).”
 

 (Emphasis added.)
 

 The trial court determined that the amendment was not arbitrary and capricious but was based on a sound reason— that the subdivision lots were not selling, that a reduction in the minimum square footage would potentially increase sales, and that, without the amendment, the value of the company’s investments, as well as the houses owned by Scott and Mary Miller and the Andersons, would decline. The trial court properly considered the surrounding facts and circumstances attending the enactment of the amendment, including the real-estate market and the financial outlook for the future of the subdivision if the lots remained unsold. In this regard, we find the decision of the Maryland Supreme Court in
 
 Matthews v. Kemewood, Inc.,
 
 supra, to be particularly instructive.
 

 In
 
 Matthews,
 
 the subdivision was conceived in 1927 as an exclusive, upscale residential development with large lots and expensive houses. The developer reserved the right to waive or modify any of the restrictions. After 1929, the lots failed to sell. The developer’s successor resubdi-vided the unsold lots into smaller parcels and modified the restriction as to minimum costs. The original lot owners sued the developer, arguing that the original plan had enhanced the value of all the lots in the subdivision, that they had purchased their lots in reliance on the general plan, and that the general plan could not be modified so as to destroy or impair the general plan. Holding that changed economic circumstances had made an alteration of the restrictions necessary to retain the vitality of the subdivision, the court stated:
 

 “It is evident that the original plan was a subdivision of large lots with expensive houses and that the present change in the plan of lots permits less expensive properties. There is evidence offered which is certainly credible that at this time it is difficult to sell large lots which
 
 *238
 
 call for the construction of large and expensive houses based on 1927 costs. Such property is not in demand .... It is also forcibly argued that unless such a resubdivision is made, the property may grow up in grass and weeds and may eventually be sold for taxes, which would certainly be more detoimental to the complainant than the plan now proposed.”
 

 184 Md. at 308, 40 A.2d at 527.
 

 Similarly, in the present case the trial court inferred “that, if lots do not sell and houses are not built, then the value of Plaintiffs’ investments would decline. Perhaps as much or more so than from the construction of smaller homes in the subdivision.” That inference was supported by evidence indicating that, because the lots were not selling and the parties were having difficulty meeting their loan obligations to the mortgagee, they were attempting to cut costs by, among other things, reducing the maintenance and upkeep of the grounds. Scott Miller submitted photographic evidence depicting unweeded flower beds, unmown grass, and plants that were dying because the watering schedule in the subdivision had been reduced.
 

 It was undisputed that Scott and Mary Miller were given proper notice of the time, place, and purpose of the property owners’ meeting on March 20, 2007, at which the amendment was discussed and put to a vote. With regard to the manner in which the amendment was enacted, there was no impropriety; the procedure outlined in § E-8 of the governing document of the subdivision was followed.
 

 At trial, Scott Miller acknowledged that the company’s real-estate listing agent had, for some time, been advising the company to lower the square-footage requirement in order to increase sales. The evidence would support an inference that Scott Miller was not blind-sided by the vote on the amendment but was aware that it was imminent and chose not to attend the property owners’ meeting. The trial court’s judgment implicitly recognized what Comment a to the
 
 Restatement (Third) of Property: Servitudes
 
 § 6.10, states as the rationale for allowing a property owners’ association to amend the governing documents in a common-interest community: to “prevent[ ] a small number of holdouts from blocking changes regarded by the majority to be necessai-y to adapt to changing circumstances and thereby permit the community to retain its vitality over time.”
 
 Id.
 
 at 196. The trial court’s application of the law concerning the reasonableness test
 
 to
 
 the facts was without error.
 

 General Scheme or Plan of Development
 

 The trial court’s careful consideration and thorough discussion of the meaning of the phrase “general scheme or plan of development” is in accord with Alabama law. The Alabama Supreme Court has already indicated that an amendment reducing the square footage in a building-requirement restriction does not render the amendment inconsistent with the general scheme or plan of development of a residential subdivision. In
 
 Schmidt v. Ladner Construction Co.,
 
 370 So.2d 970 (Ala.1979), the supreme court held that the documents governing the Carriage Hills subdivision in Mobile did not give the developer the right to unilaterally reduce the groundfloor area of a 1-story residence from 1,400 to 1,200 square feet. Discussing
 
 Schmidt
 
 in
 
 Wright,
 
 the supreme court stated that “the proposed modifications under scrutiny in
 
 [Schmidt
 
 ] neither annulled,
 
 nor were inconsistent with,
 
 the general scheme or plan of development for the subdivision or its
 
 residential
 
 use purpose.” 413 So.2d at 1121 (first emphasis added).
 

 
 *239
 
 The Alabama cases determining an amendment to be inconsistent with the general scheme or plan of development for a subdivision dealt with amendments that altered per se the exclusively residential nature and purpose of the subdivision.
 
 See Wright,
 
 supra (amendment allowing a convenience store in a residential subdivision);
 
 Moore v. Megginson,
 
 416 So.2d 993 (Ala.1982) (amendment permitting the construction of an industrial warehouse and maintenance facility in a residential subdivision).
 

 The trial court’s application of the law concerning the general-scheme or plan-of-development test to the facts was without error. The judgment of the Dale Circuit Court is affirmed.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, J., concur.
 

 BRYAN and MOORE, JJ., concur in the result, without writings.