IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 20, 2011 Session

# R. DOUGLAS HUGHES ET AL. V. NEW LIFE DEVELOPMENT CORPORATION ET AL.

**Appeal from the Chancery Court for Franklin County**
**No. 18,444; 18,956     Thomas W. Graham, Judge**

**No. M2010-00579-COA-R3-CV - Filed April 29, 2011**

In this dispute concerning the use of real property located in a common interest community, we have concluded that summary judgment based on the amendments to the restrictive covenants was not appropriate. We also find that the new owner has the authority to act as developer.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Affirmed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Frederick L. Hitchcock and Willa Beth Kalaidjian, Chattanooga, Tennessee, for the appellants, R. Douglas Hughes, M. Lynne Hughes, Louise Hubbs, and Guy Hubbs.

Joseph Addison Woodruff and Michael A. Gardner, Nashville, Tennessee, for the appellees, New Life Development Corp., Robby McGee, Jeffrey M. Dunkle, B.J. Cline.

Douglas Sevier Hale, Franklin, Tennessee, for the appellees, New Life Development Corp., Robby McGee, Jeffrey M. Dunkle, B.J. Cline.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND[1]

The appellants, R. Douglas and M. Lynne Hughes and Louise and Guy Hubbs (collectively "Homeowners"), own property and homes in a subdivision in an area commonly known as Cooley's Rift, which is located on Monteagle Mountain in Franklin County and Grundy County. Appellee, New Life Development Corporation ("New Life"), purchased approximately 1,400 undeveloped acres in Cooley's Rift as well as eleven unimproved subdivision lots in July 2005. At issue in this case is New Life's ability to develop its property.

The original developer of Cooley's Rift was Raoul Land Development Company ("RLD"), a Tennessee corporation. In 2002, RLD recorded a subdivision plat for "Cooley's Ridge Phase I" ("the subdivision") designating approximately 26 sites. RLD also recorded, in both Franklin and Grundy counties, a document entitled "Declaration of Covenants and Restrictions for Cooley's Rift Preserve" (hereinafter referred to as "the Declaration" or "the Restrictive Covenants"). Included with the Restrictive Covenants were bylaws for Cooley's Rift Homeowners' Association, Inc. Homeowners purchased their properties from RLD.

Pursuant to a special warranty deed recorded on September 6, 2005, New Life bought the property at issue from RLD. The purchase included eleven unimproved tracts in the subdivision as well as some 1,400 acres of undeveloped land. The deed provides that the transfer is subject to numerous easements and conditions, including the Restrictive Covenants.

On April 16, 2007, Homeowners[2] filed suit ("Case 1") against New Life alleging that RLD "created a comprehensive general plan for development of Cooley's Rift" prior to Homeowners' purchase of their tracts and that this plan was described in various RLD documents, including the Cooley's Rift descriptive booklet and design guidelines. Homeowners asserted that, "The Cooley's Rift Plan promised extensive common properties and amenities (the "Amenities and Preserves") for the benefit of the Plaintiffs and other owners of home lots in Cooley's Ridge. . . ." In purchasing their lots, Homeowners asserted, they reasonably relied upon RLD's representations that Cooley's Rift would be developed

---

[1]Our factual summary draws in part from the facts set forth in our opinion in the previous appeal in this case. *See Hughes v. New Life Dev. Corp.*, No. M2008-00290-COA-R3-CV, 2009 WL 400635, at *1 (Tenn. Ct. App. Feb. 17, 2009).

[2]The original plaintiffs included four other homeowners (two couples) in addition to the appellants. These two couples obtained voluntary dismissals after an affiliate of New Life bought their homesites.

in accordance with the plan. Homeowners further alleged that New Life knew of this plan when it bought property in Cooley's Rift and took title subject to the plan. According to the complaint, New Life had announced its "intent to develop its property in Cooley's Rift in ways that violate the Cooley's Rift Plan and the Restrictive Covenants."

The complaint sets out seven counts: (1) an action for enforcement of three express restrictions of the Restrictive Covenants, (2) a derivative action on behalf of the Homeowners Association to enforce the express covenants, (3) a derivative action for an injunction *qui timet* "to prevent New Life from altering or destroying any of the Amenities and Preserves," (4) a derivative action for specific enforcement of "the transfer of title to the Amenities and Preserves to the Homeowners Association, as required by the Restrictive Covenants," (5) an alternative derivative action for a constructive trust to protect the Homeowners Association's rights in the Amenities and Preserves, (6) action for enforcement of Cooley's Rift development plan created by RLD and "enforceable by the Plaintiffs as implied covenants that are binding upon New Life as the successor to the Raoul Company with the knowledge of the Cooley's Rift Plan," and (7) a direct action to impose a constructive trust.

On November 27, 2007, the trial court granted New Life's motion for judgment on the pleadings. In its order, the court found that "the Declaration of Covenants And Restrictions For Cooley's Rift Preserve confines these covenants and restrictions to those lands that fall within the boundaries of the lots and roads as shown on the recorded plat entitled 'Cooley's Rift Subdivision, Phase I.'" The court further concluded that, pursuant to the terms of the Restrictive Covenants, there were no implied covenants applicable to New Life's unsubdivided property. As to the Homeowners' constructive trust arguments, the court concluded that, in light of the disclaimer in the brochure and the language of the recorded Restrictive Covenants, the Homeowners were not entitled to equitable relief in the form of a constructive trust. Having rejected the bases for relief underlying all of the Homeowners' claims, the court granted judgment on the pleadings in favor of New Life.

In the first appeal in this matter, this court concluded that the trial court erred in granting judgment on the pleadings with respect to the following claims: claims premised upon New Life's proposed actions as to enumerated subdivision lots and claims based upon implied restrictive covenants arising from the recorded subdivision plats or from a general development plan. *Hughes v. New Life Dev. Corp.*, No. M2008-00290-COA-R3-CV, 2009 WL 400635, at *9 (Tenn. Ct. App. Feb. 17, 2009).

On June 28, 2009, at a special meeting called by persons designated by New Life as the board of directors of the Homeowners Association ("HOA"), 19 of the 22 HOA member votes were cast in favor of amending certain provisions of the HOA charter and the

Restrictive Covenants.[3] The stated purpose of the amendments was to resolve issues about which the case had been remanded by this court. Six HOA members (including Homeowners) cast their three votes against the proposed amendments.[4]

The Homeowners filed a second lawsuit ("Case 2") on August 11, 2009, against appellees Robby McKee, Jeffrey M. Dunkle, and B.J. Cline, persons appointed by New Life to act as members of the HOA board of directors. All three defendants were identified as officers and employees of New Life International, the non-profit corporation on whose behalf New Life Development, Inc. ("New Life") had purchased the property at Cooley's Rift. The Homeowners claimed that the defendants were not lawfully elected as HOA directors and officers and had acted unlawfully in amending the charter and restrictive covenants and in undertaking other actions. The Homeowners complaint in Case 2 includes a request for an injunction prohibiting the defendants from taking any action to enforce the charter and restrictive covenant amendments, a derivative action to enforce the restrictive covenants, and a derivative action for an injunction *quia timet*. Case 1 and Case 2 were consolidated by the trial court.

Homeowners filed a motion for summary judgment as to Case 2, and the defendants filed a motion for summary judgment as to Case 1. The trial court entered a memorandum opinion and order on January 5, 2010. Both sides filed motions to alter or amend, and the court entered a final order on January 29, 2010, in which it included revisions to its original order. In its memorandum, the court addressed five issues raised by the parties:

1. Whether New Life obtained the right to act as the developer of Cooley's Rift. The court concluded that its deed gave New Life all of Raoul's rights and interests, including the right to act as the developer.

2. Whether the amendments to the charter and Restrictive Covenants passed by the HOA on June 28, 2009 resolved the ambiguities regarding express restrictions and possible implied restrictions arising from a general plan of development. The trial court held that these questions were resolved in the defendants' favor.

3. Whether New Life's charter gave it the authority to develop its property. The trial court agreed with the plaintiffs' concerns on this issue, stating that the "[g]eneration

---

[3]This meeting occurred during the pendency of a Tenn. R. App. P. 11 application filed by the defendants in Case 1. The Supreme Court denied this application on June 30, 2009.

[4]Under the bylaws, members are entitled to only one vote per homesite, and no more than one vote may be cast for each homesite (except for those owned by the developer).

of active business income of the type apparently inherent in at least portions of the development plan announced by New Life Development, Inc. appear to be prohibited by Section 501(c)(2) and Article VIII, Section (e), of New Life's charter."

4. Whether the recorded plan contains information sufficient to impose an implied restrictive covenant to establish forest preserves. The court examined the plats and found that the words "east preserve" and "west preserve" were not legible. The court concluded that "[t]here is simply nothing on the instrument as recorded in the two (2) Register's offices [in both Franklin County and Grundy County] which can be used to define and locate or even suspect the location of a restricted area."

5. Whether the plaintiffs have standing to bring derivative claims. The court concluded that the plaintiffs' two votes represented less than five percent of the voting power required by Tenn. Code Ann. § 48-56-401.

Based upon these rulings, the trial court granted summary judgment in favor of New Life on all seven counts of Case 1 and resolved all three counts of Case 2 in favor of the defendants. The court went on, however, to enjoin New Life from "engaging in any development which would be a prohibited activity under Article VIII, Section (e) of its Charter." Homeowners have again appealed.

The issues presented by the plaintiffs on appeal are (1) whether the trial court erred in granting New Life summary judgment in Case 1; (2) whether the trial court erred in denying the plaintiffs summary judgment in Case 2; and (3) whether the trial court erred in granting the individual defendants summary judgment in Case 2. New Life presents the additional issue of whether the trial court erred in granting the plaintiffs an injunction against New Life performing real estate development activity.

STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson,* 100 S.W.3d 202, 205 (Tenn. 2003). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we must determine whether factual disputes exist. *Byrd v. Hall,* 847 S.W.2d 208, 211 (Tenn. 1993). If a factual dispute exists, we must determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Id.; Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102,

104 (Tenn. Ct. App. 1998). To shift the burden of production to the nonmoving party who bears the burden of proof at trial, the moving party must negate an element of the opposing party's claim or "show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.,* 270 S.W.3d 1, 8-9 (Tenn. 2008).

ANALYSIS

Authority of New Life to act as developer

A preliminary issue relevant to both cases is whether New Life obtained the right to act as the developer when it bought RLD's property in Cooley's Rift. Homeowners argue that only RLD was authorized to act as the developer. We disagree.

The purchase and sale agreement dated July 5, 2005, provides that New Life is purchasing the Cooley's Rift property "together with all easements, rights and privileges appurtenant thereto, . . . the Work Product Documents hereinafter defined and the name "Cooley's Rift" and all derivations thereof." An attachment to the agreement lists the Work Product Documents, which include marketing literature, design guidelines, bylaws, site plan, architectural designs for certain amenities (including a gate house, lodge, and manager's house), and information related to a dam project. The express inclusion of these development-related materials is consistent with the conclusion that RLD and New Life intended for New Life to take over the role of developer.

The key document with respect to the interests conveyed is, of course, the deed itself. In interpreting a deed, our primary purpose is to determine the grantor's intent. *Cellco P'ship v. Shelby County*, 172 S.W.3d 574, 586 (Tenn. Ct. App. 2005). We begin with the language of the deed and the circumstances surrounding its creation. *Id.* Under Tennessee law, "a deed conveys all of a grantor's estate or interest in property unless it clearly expresses an intent to limit the estate or interest conveyed." *Id.* at 587 (citing Tenn. Code Ann. § 66-5-101). The trial court emphasized the deed's broad habendum clause: "TO HAVE AND TO HOLD said tract of land, with the appurtenances, estate, title and interest thereto belonging to said Grantee, its successors and assigns, forever." The deed provides that New Life receives the property subject to the recorded Restrictive Covenants. The Restrictive Covenants define "Developer" as RLD "and its successors and assigns."

In arguing that New Life did not become the developer, Homeowners emphasize the HOA charter's provision that "[t]he rights, duties and functions of the Board of Directors shall be solely exercised by Developer" until the developer decides to allow the HOA members to elect a board of directors. So, argue the Homeowners, only RLD could call a meeting of the HOA board of directors even after it sold its property in Cooley's Rift to New

Life. This court must, however, avoid a construction of the charter that would produce an absurd result. *See In re Estate of Soard*, 173 S.W.3d 22, 28 (Tenn. Ct. App. 2005). Under the HOA bylaws, membership automatically transfers to a new property owner upon the conveyance of a homesite and "[m]embership shall be appurtenant to and may not be separated from ownership of any Homesite." The interpretation espoused by Homeowners would lead to the anomalous result that the HOA directors would be unable to act without RLD, which no longer owns any property in Cooley's Rift and thus cannot be member of the HOA.[5] Such a situation would effectively prevent the HOA from functioning.

Based upon the deed and all of the related documents and circumstances, we conclude that the only reasonable interpretation is that RLD transferred its position as developer to New Life.[6]

Derivative claims

In Case 1 and Case 2, some of the plaintiffs' claims are derivative claims brought on behalf of the HOA. The trial court held that the plaintiffs lacked standing to bring these claims, and we agree.

Pursuant to § 4.02 of the HOA bylaws, members are entitled to "one vote each for each Homesite in which they hold [an] interest." This section goes on to state that "in no event shall more than one vote be cast with respect to any such Homesite." Thus, as HOA members, the plaintiffs are entitled to two votes by virtue of their ownership of lots 2 and 3 of the subdivision. Under § 4.02(b) of the HOA bylaws, the "Developer shall be entitled to five (5) votes for each Homesite owned by the Developer." New Life owns eleven (11) of the 24 platted lots in Cooley's Rift, which gives New Life 55 votes.

> Tenn. Code Ann. § 48-56-401(a) governs the right to bring derivative claims:
> A proceeding may be brought in the right of a domestic or foreign corporation
> to procure a judgment in its favor by:
>
> (1) Any member or members having five percent (5%) or more of the voting
> power or by fifty (50) members, whichever is less; or

---

[5]According to the defendants, RLD is no longer an active corporation.

[6]We decline to consider the plaintiffs' argument that New Life, by virtue of its status as a corporation chartered under § 501(c)(2) of the Internal Revenue Code, cannot act as a developer. New Life's tax exempt status is a matter for determination by the Internal Revenue Service.

(2) Any director.

With two (2) of a total of 68 votes, the plaintiffs have only 2.9% of the voting power, not enough to bring a derivative action.

## Summary judgment in Case 1

*Amendments*

In moving for summary judgment in Case 1, New Life relied in large part upon the amendments to the HOA charter and to the Restrictive Covenants enacted on June 28, 2009. Homeowners challenge the validity of these amendments.

A summary of the amendments is in order. Section 10 of the original charter stated that the developer would exercise the duties and functions of the HOA board of directors until the developer in its discretion called a special meeting for the election of a board of directors from the association members. This section of the charter was amended to clarify that the "rights, duties and functions of the Board of Directors shall be solely exercised by New Life Development, Inc., as successor and assign of Raoul Land and Development Company . . . ."

The amendments to the Restrictive Covenants are much more extensive and substantive than the charter amendments:

• Article 1.06 defines "common properties" to be deeded or leased to the HOA and to be devoted to "the common use and enjoyment of the Owners." The amendment changed the definition by deleting "wilderness preserve areas" from the list of items included in common properties.

• Article 1.10 defines "developer" and was amended to specify that New Life was the developer.

• Article 1.11 defines "dwelling." The original restrictions defined dwelling as "any building situated upon the Property designated and intended for use and occupancy by a single family, including any single-family detached house located within the Property." The amendments added the following phrase to the definition: "or shall mean any building situated upon the Property designated and intended for use and occupancy other than a single family if such other use is specifically consented to by Developer or the Board in writing."

-8-

- Article 1.14 defines "homesite." The original restrictions stated that a homesite was an unimproved parcel of land intended as a site for a dwelling as shown on the recorded subdivision map. The amendments provide that a homesite is a parcel "designated" as a site for a dwelling on the recorded map "or as otherwise permitted by this Declaration."

- Article 1.16 defines "master plan." In the original restrictions, the master plan was defined to refer to "the drawing which represents the conceptual land plan for the future development of Cooley's Rift Preserve prepared by DM Survey, Inc." The amendments state that the master plan shall refer to "the most recent conceptual land plan for the future development of Cooley's Rift Preserve prepared by or on behalf of Developer, as adopted, amended or modified from time to time by Developer, in its sole and absolute discretion." (The next sentence of Article 1.16, which was not changed by the amendments, provides that the master plan shall refer to the most recent revisions thereof.)

- Article 2.01 defines "property." This article was amended to eliminate references to landscaping and maintenance of recreational facilities, conservation purposes, and wilderness preserves with hiking and riding trails. In their original form, the restrictions stated, "The Master Plan shall not bind the Developer, its successors and assigns, to adhere to the Master Plan in the development of the land shown thereon except as to the general location and approximate acreage of the Common Properties." The amendments specify that the developer is to be bound by the master plan only as to common properties created pursuant to Section 1.06. Furthermore, the amendments take out qualifying language in the last sentence of Article 2.01 (making the developer's powers subject to limitations stated previously in the paragraph). The final sentence of Article 2.01 now states: "The Developer shall have full power to add to, subtract from or make changes in the Master Plan, in its sole and absolute discretion."

- Article 3.02 generally limits homesites to residential use. The amendments add the following qualification: "unless such other use is specifically consented to by Developer or the Board in writing and approved, if required, by all applicable governmental authorities."

- Article 3.03 generally prohibits the use of homesites for multi-family residences, business purposes, or for equipment inconsistent with ordinary residential uses. The amendments add the following qualification: "[u]nless such other use is specifically consented to by Developer or the Board in writing and approved, if required, by all applicable governmental authorities."

•       Article 3.06 generally limits homesites to one dwelling and prohibits the resubdividing of homesites. The amendments again add qualifying language: "unless such other use is specifically consented to by Developer or the Board in writing and approved, if required, by all applicable governmental authorities."

A review of these amendments to the Restrictive Covenants reveals that they give the developer unfettered discretion to change the terms of the Restrictive Covenants, including the permissible uses of the land within the subdivision itself.[7] New Life argues that the amendments also correct any ambiguities in the Restrictive Covenants, thereby eliminating the plaintiffs' theory of implied restrictive covenants based upon a general plan of development.[8]

In determining the effect of these amendments, we consider the nature of the development at issue here: a residential common interest community. In common interest communities, "the property is burdened by servitudes requiring property owners to contribute to maintenance of commonly held property or to pay dues or assessments to an owners association that provides services or facilities to the community." RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 6 introductory note at 67 (2000). These types of developments involve important public interests, including providing a mechanism for controlling the community environment. *Id.* at 68. The law governing these types of communities continues to develop. The RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES recognizes that this area of the law "should facilitate the operation of common-interest communities at the same time as it protects their long-term attractiveness by protecting the legitimate expectations of their members." *Id.* at 71.

The effect of common interest servitudes often depends upon the power of the developer or the association to amend the servitudes. The latest RESTATEMENT contains a provision governing community members' power to amend the declaration of servitudes. Although a majority or two-thirds vote is sufficient for many amendments, the following provisions protect the interests of the minority:

> (2) Amendments that do not apply uniformly to similar lots or units and amendments that would otherwise violate the community's duties to its

---

[7]In our previous opinion, we concluded that the Restrictive Covenants, by their terms, apply only to the enumerated subdivision lots. *Hughes*, 2009 WL 400635, at *4.

[8]In our previous opinion, we concluded that, due to ambiguities in the Restrictive Covenants, the trial court erred in granting judgment on the pleadings with respect to the plaintiffs' theory of implied restrictive covenants based upon a general plan of development. *Hughes*, 2009 WL 400635, at *9.

members under § 6.13 are not effective without the approval of members whose interests would be adversely affected unless the declaration fairly apprises purchasers that such amendments may be made. . . .

(3) Except as otherwise expressly authorized by the declaration, and except as provided in (1), unanimous approval is required

(a) to prohibit or materially restrict the use or occupancy of, or behavior within, individually owned lots or units, or

(b) to change the basis for allocating voting rights or assessments among community members.

*Id.* at § 6.10. Section 6.13 provides that a common interest community association has certain duties to its members, including treating members fairly and acting "reasonably in the exercise of its discretionary powers including rulemaking." Similarly, section 6.21 prohibits a developer from exercising a power to amend or modify a declaration of servitudes "in a way that would materially change the character of the development or the burdens on the existing community members unless the declaration fairly apprises purchasers that the power could be used for the kind of change proposed."

A review of caselaw from other states reveals that "the majority of courts in other jurisdictions that have considered the question have held that the power to amend a restrictive covenant by a vote of less than 100% of the property owners in a subdivision is subject to a 'reasonableness' standard." *Miller v. Miller's Landing, L.L.C.*, 29 So. 3d 228, 235 (Ala. Civ. App. 2009); *see also Armstrong v. Ledges Homeowners Ass'n*, 633 S.E.2d 78, 87 n.2 (N.C. 2006); *Mulligan v. Panther Valley Prop. Owners Ass'n*, 766 A.2d 1186, 1191 (N.J. Super. Ct. App. Div. 2001). The reasonableness standard has been described in various ways. In *Armstrong*, the court held that "every amendment must be *reasonable* in light of the contracting parties' original intent." *Armstrong*, 633 S.E.2d at 87. The court went on to state that reasonableness could be ascertained "from the language of the original declaration of covenants, deeds, and plats, together with other objective circumstances surrounding the parties' bargain, including the nature and character of the community." *Id.* at 88. Another court described the appropriate analysis to be "whether the rule is reasonable under the surrounding circumstances." *Worthinglen Condo. Unit Owners' Ass'n v. Brown*, 566 N.E.2d 1275, 1277 (Ohio Ct. App. 1989). Courts may also seek to determine whether an amendment is unreasonable, arbitrary, or capricious. *Hutchens v. Bella Vista Vill. Prop. Owners' Ass'n, Inc.*, 110 S.W.3d 325, 330 (Ark. Ct. App. 2003); *Buckingham v. Weston Vill. Homeowners Ass'n*, 571 N.W.2d 842, 844 (N.D. 1997); *Worthinglen*, 566 N.E.2d at 1277;

Many courts go further to require that the amendments be consistent with the general plan of development or that they not destroy the general plan of development. *See Holiday Pines Prop. Owners Ass'n, Inc. v. Wetherington*, 596 So. 2d 84, 87 (Fla. Dist. Ct. App. 1992); *Meresse v. Stelma*, 999 P.2d 1267, 1273 (Wash. Ct. App. 2000); *Shafer v. Bd. of Trustees of Sandy Hook Yacht Club Estates, Inc.*, 883 P.2d 1387, 1392 (Wash. Ct. App. 1994); *see also N. Country Villas Homeowners Ass'n v. Kokenge*, 163 P.3d 1247, 1255 (Kan. Ct. App. 2007) (finding a developer's amendments unenforceable because the general power to amend the declarations did not fairly apprise purchasers of possibility of drastic changes that would "materially change the character of the development").

While they have not been called upon to address the precise issue presented in this case, we note that Tennessee courts have cited with approval the principal of construction adopted in the RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES that servitudes should be interpreted to give effect to the intention of the parties in light of the language used and the surrounding circumstances, and to carry out the purpose for which the servitudes were created. *See Fanning v. Wallen*, No. E2001-00228-COA-R3-CV, 2001 WL 950001, at *5 (Tenn. Ct. App. Aug. 21, 2001); *Maples Homeowners Ass'n, Inc. v. T & R Nashville Ltd. P'ship*, 993 S.W.2d 36, 39 (Tenn. Ct. App. 1998) (also citing more traditional rule that courts should adopt a construction of restrictions that promotes the free use of property); RESTATEMENT (THIRD) OF PROP.: SERVITUDES at § 4.1.

We consider the case of *Wilson v. Woodland Presbyterian School*, No. W2001-00054-COA-R3-CV, 2002 WL 1417064 (Tenn. Ct. App. June 25, 2002), to be the most factually similar to the case before us. *Wilson* involved the application of protective covenants in a residential subdivision limiting structures to one or two family dwellings and certain outbuildings. *Id.* at *1. A school adjacent to the subdivision owned two lots within the subdivision and began building a playground on one lot. *Id.* Homeowners filed a lawsuit challenging the school's actions, and the school obtained the approval of a majority of the lot owners in the subdivision to an amendment to the restrictive covenants to remove the restrictions from the school's two lots. *Id.* Citing § 6.10 of the RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES, this court agreed with the trial court's reasoning that "it would be unfair and inequitable for the Court to allow owners who are not within immediate proximity of the subject lots to make decisions that adversely impact on the adjacent homeowners and not themselves." *Id.* at *6. In reviewing caselaw from other jurisdictions, the court quoted the following general statement: "For the most part, the trend appears to integrate these [amendment] provisions narrowly in order to protect individual expectations of a uniform scheme from alterations effectuated by less than a unanimous group of homeowners." *Id.* (quoting Patrick A. Randolph, *Changing the Rules: Should Courts Limit the Power of Common Interest Communities to Alter Unit Owners' Privileges in the Face of Vested Expectations?* 38 SANTA CLARA L. REV. 1081, 1105 (1998)). Because the amendments did

not apply uniformly to all lots and were not approved by all adversely affected property owners, and the provisions regarding amendment of the protective covenants did not "apprise purchasers that amendments to the covenants may apply in a non-uniform manner to lots within the subdivision," the court agreed with the trial court's conclusion that the amendments were invalid. *Id.* at *7.

In light of the principles applied in *Wilson* and the majority view adopted in other jurisdictions, we must conclude that the amendments adopted by the HOA to change certain definitions and give New Life unfettered discretion to change the restrictions applicable within the subdivision did not entitle New Life to summary judgment.[9] We reach the same conclusion as to the attempted amendments to eliminate possible implied restrictive covenants arising out of a general plan of development.[10] At further proceedings on remand, the trial court should consider whether the amendments, opposed by some HOA members, are reasonable in light of the original intent of the contracting parties and the totality of the surrounding circumstances, including whether the purchasers were apprised that such amendments could be made and whether the amendments materially change the character of the development.

*Recorded plat*

The other theory available to the plaintiffs to establish implied restrictive covenants is implication by reference to a plat. *See Hughes*, 2009 WL 400635, at *9. The trial court concluded, based upon its review of the record, that "there is nothing from which such an implication can be made because it is undisputed that neither the words 'east preserve' or 'west preserve' nor any other inscriptions relative to same are legible thereon [on the recorded plat]."

The 2002 recorded plat for Cooley's Rift Phase I is specifically referenced in New Life's deed. The plaintiffs assert that New Life took its property subject to implied restrictive covenants arising from the recorded plat, including the designation of an East

---

[9]We find nothing objectionable in the charter amendment and declaration amendments designed to clarify that New Life stepped into the role of developer.

[10]We recognize that, in an appropriate case, judicial modification of a declaration might arguably be justifiable in light of changed circumstances. *See Miller*, 29 So. 3d at 236-37. In this case, however, New Life made no attempt to justify the amendments and cannot establish its entitlement to summary judgment simply by referencing amendments adopted by fewer than all of the affected property owners.

Preserve and a West Preserve with a combined area of 725.7 acres.[11] New Life counters that the alleged designations of forest preserves relied upon by the plaintiffs are not legible on the recorded plat and therefore could not create implied restrictive covenants.

The core issue in this case with respect to this theory of implied restrictive covenants is the issue of notice. New Life argues that it had no notice of restrictions on the development of the Cooley's Rift property from the recorded plat and therefore could not be subject to any such restrictions. It is well-settled that "an owner of land is not bound by covenants restricting the use of land by his remote grantor, when such covenants do not appear in the owner's chain of title and when he had no actual notice of the alleged covenant at the time he acquired title." *Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d 923, 930 (Tenn. 1979) (quoting *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904, 913 (Tenn. 1976)); *see also Massey v. R.W. Graf, Inc.*, 277 S.W.3d 902, 910 (Tenn. Ct. App. 2008).

The trial court found that the words "east preserve" and "west preserve" were not legible on the recorded plat. We do not, however, consider this finding to be the end of the matter. To be entitled to summary judgment, New Life had to shift the burden of production to the plaintiffs by negating an element of their claim or showing that the plaintiffs could not prove an essential element of their claim at trial. *Hannan,* 270 S.W.3d at 8-9. The blurriness of the relevant words on the recorded plat does not conclusively establish the absence of actual notice. The plaintiffs could establish that New Life had actual knowledge of the forest preserves. Moreover, actual notice includes inquiry notice, or "knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts." *Texas Co. v. Aycock*, 227 S.W.2d 41, 46 (Tenn. 1950); *see also Blevins v. Johnson County*, 746 S.W.2d 678, 683 (Tenn. 1988); *Stracener v. Bailey*, 737 S.W.2d 536, 539 (Tenn. Ct. App. 1986). Disputed material facts remain as to whether, under the relevant circumstances, New Life should have found out or actually did know what the blurry words on the plat said.

Therefore, except with respect to the derivative claims, we reverse the trial court's grant of summary judgment to New Life in Case 1.

---

[11]The plaintiffs also point out that, in addition to these preserves, the 2002 plat shows Lake Louisa, a network of roads, and a restriction of homesite development to single family dwellings. These issues were not addressed by the trial court and, given our conclusion with respect to the forest preserves, we need not address them here.

## Summary judgment in Case 2

Case 2 involves three claims: an individual action for injunction and two derivative claims.  Given our conclusion above concerning the plaintiffs' lack of standing to bring derivative claims, we must conclude that the trial court properly dismissed the two derivative actions.  The first claim asks for an injunction prohibiting the defendants "from taking any action to enforce or apply any of the amendments to the Homeowners Association Charter and Restrictive Covenants unlawfully adopted in the June 28, 2009 meeting."  In light of our determinations regarding the legality of the attempted amendments to the restrictive covenants, we must conclude that the trial court's grant of summary judgment to the defendants on this claim was erroneous. Because of the existence of material factual disputes regarding the validity of the attempted amendments, we must also reject the plaintiffs' argument that they were entitled to summary judgment on this claim.

## Injunction against New Life

New Life raises an issue as to the propriety of the trial court's injunction prohibiting it from engaging in any activity prohibited by its charter–i.e., in violation of its status under § 501(c)(2) of the Internal Revenue Code.

In light of the foregoing holdings, we consider it unnecessary to address all of the arguments on this issue.  Portions of the trial court's final order have been reversed by this court, and the matter will be remanded for further proceedings.  Tenn. R. Civ. P. 65.01 authorizes the issuance of a permanent injunction "in a final judgment."  Since we are overturning the final judgment issued by the court below and remanding for further proceedings, the injunction issued by the trial court should be vacated.

## CONCLUSION

For the reasons discussed above, the trial court's judgment is affirmed in part and reversed in part.  Costs of appeal are assessed one-half against the appellants and one-half against the appellees.

_____
ANDY D. BENNETT, JUDGE