[No. 33406-9-I.    Division One.    November 28, 1994.]

ROBERT J. SHAFER, ET AL, *Appellants*, v. THE BOARD OF
TRUSTEES OF SANDY HOOK YACHT CLUB ESTATES, INC.,
ET AL, *Respondents*.

*John A. Burke,* for appellants.

*Peter Moote, Peter Moote & Associates,* and *Michael H. Himes,* for respondents.

PEKELIS, C.J. — The Appellants/relators (the relators)[1] brought a quo warranto proceeding in the name of the State of Washington, pursuant to RCW 7.56, against Sandy Hook Yacht Club Estates, Inc. (Sandy Hook or the Corporation) and its board of trustees (the Board). Sandy Hook is a nonprofit corporation consisting of all property owners within the Sandy Hook plat. The relators, who are minority members of the Corporation, challenged the Corporation's legal authority to adopt new restrictions in the nature of restrictive covenants that would bind all Sandy Hook property owners without having first obtained the agreement of all affected property owners. After stipulating that there were no material facts in dispute, the parties brought cross motions for summary judgment. The relators appeal from the trial court's ruling in favor of Sandy Hook. We affirm.

The facts of this case arise from the formation of a development, known as Sandy Hook Yacht Club Estate. This development, located on Whidbey Island, is made up of more

---

[1] In a quo warranto proceeding, where the right to sue resides in the State, the term "relator" refers to the party in interest. *See* RCW 7.56.020; Black's Law Dictionary 1289 (6th ed. 1990).

than 280 platted lots and is described as "an upscale, year-round, residential development with considerable focus on its waterfront recreational amenities".

On May 26, 1960, the plat was dedicated and duly recorded in Island County, Washington. The plat dedicated to Sandy Hook, the respondent corporation, all streets, avenues, places, and utility easements, in addition to nine lots, which are now recreational facilities (the Common Amenities) for use by all Sandy Hook property owners. The plat dedication sets forth three unenumerated restrictive covenants, five enumerated restrictive covenants, and a residential purpose restrictive covenant (in total comprising the "original covenants").[2] The plat dedication recites in relevant part:

> All lots are restricted for residential purposes EXCEPT the following lots which may be used for commercial purposes: ...; AND EXCEPT the following lots and tracts which are dedicated to the Sandy Hook Yacht Club Estates, Inc. as follows: Tracts A, B, and C; Lots 1, 65, and 122, Block 8.
> *Subj. to art. of Incorp. and by-laws of Sandy Hook Yacht Club Est., Inc. & regulations, reserv., & restrictions contained therein.*
> IN WITNESS WHEREOF we have hereunto set our hands and seals....

(Italics ours.)

Sandy Hook was formed concurrently with the creation of the development. The articles of incorporation (the Articles) were executed on June 6, 1960, and were recorded with the Washington Secretary of State on June 8, 1960, the same day that the Board adopted the original bylaws (the Bylaws). The Articles and Bylaws were then recorded in Island County's records on December 26, 1972. It is undisputed that all Sandy Hook property owners purchased their lots after June 13, 1960, and that all relators "had constructive notice of the documents that were properly recorded with the Island County Auditor as of the date of purchase of their property".

The Articles list the purposes for which the Corporation was formed, which include:

---

[2]The enforceability of the original covenants is not at issue.

6. *To enforce* ... restrictions, conditions and covenants existing upon *and/ or created* for the benefit of parcels of real property in the plat of Sandy Hook Yacht Club Estates, Inc. . . .

8. To exercise such powers of control, interpretation, construction, consent, decision, determination, modification, amendment, cancellation, annulment and/or enforcement of covenants, reservations, restrictions, liens and charges imposed upon said property, and as may be vested in, delegated to, or assigned to said corporation and such duties with respect thereto as may be assigned to and assumed by said corporation.

12. Generally, to do any and all lawful things which may be advisable, proper, authorized and or permitted to be done by said corporation under or by virtue of any restrictions, conditions, and/or covenants or laws *affecting said property, or any portions thereof (including areas now or hereafter dedicated to public use)*; and to do and perform any and all acts which may be either necessary for, or incidental to, the exercise of any of the foregoing powers or for the peace, health, comfort, safety, and/or general welfare of owners of said property, or portions thereof, or residents thereon.

14. Generally, to do and perform any and all acts which may be either necessary or proper for or incidental to the exercise of any of the foregoing powers and such powers granted by the provisions of Title 24, Revised Code of Washington, and other laws of the State of Washington relating to non-profit corporations.

16. All of the foregoing purposes and powers are to exercised and carried into effect for the purpose of doing, serving and applying the things above set forth for the benefit of *all property* situated in the plat of Sandy Hook Yacht Club Estates....

(Italics ours.)

The Bylaws vest the Board with all corporate powers, including the power to

conduct, manage and control the affairs and business of the corporation, and *to make such rules and regulations therefor not inconsistent with law, with the Articles of Incorporation* [sic] *or the By-laws* as they may deem best.

(Italics ours.) Each Sandy Hook property owner is entitled to one vote in the transaction of corporate business. The Bylaws may be amended, either at an annual or special meeting, by a vote of 60 percent of the members present, either in person or by proxy, provided that written notice of the proposed amendment is given to the members with the notice of the call of the meeting.

In 1971, 1985, and 1991, Sandy Hook amended some of the

original covenants and adopted new restrictions in the nature of restrictive covenants respecting the use of privately owned property within the subdivision (hereinafter covenant changes).[3] For instance, in 1991, Sandy Hook adopted the following restriction:

> *Storage of vehicles*: No motor vehicle shall be stored outdoors if it has not been operated for a period of six (6) months and meets any of the following criteria: (1) Is extensively damaged, such damage including but not limited to any of the following: A broken window or windshield or missing wheels, tires, engine or transmission. (2) Is apparently inoperable. (3) Is without a current, valid registration plate. (4) Has a current fair market value only to the value of the scrap in it.

It is undisputed that these covenant changes were adopted pursuant to the procedures established in the Articles and the Bylaws, *i.e.*, that requisite notice of the proposed covenant changes was given and that the changes were approved by the requisite percentage of the members.

On July 20, 1991, a special meeting of Sandy Hook's members was held, where the 1991 covenant changes were designated as "Property Rules" and resubmitted for a vote. The parties stipulated that the purpose of the vote "was to change the classification of the previously approved amendments from covenant amendments to by-law amendments and Property Rule changes."[4] This amendment was also passed in accordance with the procedures established in the Articles and the Bylaws. In 1992, the members approved a revised bylaw Article 13, entitled "Property Rules", which was intended to reaffirm and clarify the 1991 Property Rules.[5] It is

---

[3]The 1971 covenant changes are prefaced by: "[P]ursuant to the authority granted in said Dedication and in the Articles of Incorporation and By Laws of Sandy Hook Yacht Club Estates, Inc., the membership thereof wish to modify, amend, and add to the provisions of said Dedication."

[4]Apparently, counsel had advised the Board that amending the original covenants would require the agreement of all Sandy Hook property owners, while amending the Bylaws would require the agreement of only 60 percent of the members present.

[5]The 1994 information pamphlet, which contains the Property Rules and which Sandy Hook distributes to new property purchasers within the development, was not part of the record below. Therefore, we do not consider it on appeal.

undisputed that none of the covenant changes were approved by all of Sandy Hook's members. All covenant changes were duly filed and recorded with the Island County Auditor.

In March 1992, in response to a complaint about an "abandoned auto", the Board wrote to relator Robert Shafer (Shafer) requesting that he remove an automobile from his lot because it appeared to violate the property rule regarding the outdoor storage of vehicles. After Shafer failed to do so, the Board sent him notice of a hearing on the matter. At the hearing, which Shafer did not attend, the Board determined that the vehicle violated the property rules and must be removed.

In April 1992, in response to a complaint about the use of a private dock for commercial fishing purposes, the Board sent Earl Dunsmore (Dunsmore), a relator and the dock's owner, a complaint alleging that one of Dunsmore's tenants had violated the "residential harbor rules". Sandy Hook has deferred enforcement of both incidents pending resolution of this case.

In August 1992, the relators brought a quo warranto proceeding under RCW 7.56. Pursuant to RCW 7.56.010(5), the information challenged Sandy Hook's legal authority to adopt new restrictions in the nature of restrictive covenants respecting the use of privately owned land within the Development without the agreement of all affected property owners. After the parties brought cross motions for summary judgment, the trial court ruled in Sandy Hook's favor, concluding:

> [T]hat defendant Sandy Hook Yacht Club Estates, Inc. acted within its legal authority in the enactment of the challenged rules regulating the non-commercial use of private docks and restricting outdoor storage of motor vehicles that have not been operated for a period of six months or more; and

> [T]hat defendant Sandy Hook Yacht Club Estates, Inc. has the legal authority to enact reasonable restrictions on the uses of privately-owned property within the plat of Sandy Hook Yacht Club Estates, as long as it does so under appropriate and proper corporate procedure.

Accordingly, the court granted Sandy Hook's summary judgment motion, denied the relator's summary judgment motion, and dismissed the case with prejudice.[6]

---

[6] In addition, the court ruled that each party was responsible for its own attorney's fees and costs.

On appeal, the relators' principal contention is that the trial court erred, as a matter of law, in deciding that Sandy Hook has legal authority to adopt new restrictions in the nature of restrictive covenants that bind all Sandy Hook property owners without the agreement of all affected property owners.[7]

■ Because the facts are undisputed and the only issues are questions of law, the standard of review is de novo. *Department of Labor & Indus. v. Fankhauser*, 121 Wn.2d 304, 308, 849 P.2d 1209 (1993).

The relators conceded at oral argument that if a valid agreement expressly reserves the power to less than 100 percent of affected property owners to adopt new restrictions respecting the use of privately owned property within the development, such restrictions are enforceable against all property owners. This concession is appropriate in light of the overwhelming, albeit out-of-state, authority to this effect. *See Boyles v. Hausmann*, 246 Neb. 181, 517 N.W.2d 610 (1994); *see also Hanchett v. East Sunnyside Civic League*, 696 S.W.2d 613 (Tex. Ct. App. 1985); *cf.* 5 Richard R. Powell, *Real Property* 677 (1988); *Hening v. Maynard*, 227 Va. 113, 313 S.E.2d 379 (1984).

For its part, Sandy Hook concedes that it must exercise its power to adopt new restrictions respecting the use of privately owned land "in a reasonable manner [so] as not to destroy the general scheme or plan of development.' " *Lakemoor Comm'ty Club, Inc. v. Swanson*, 24 Wn. App. 10, 15, 600 P.2d 1022 (quoting *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.*, 303 So. 2d 665, 666 (Fla. Dist. Ct. App. 1974)), *review denied*, 93 Wn.2d 1001 (1979).

■ We agree with these concessions and take the opportunity to hold that an express reservation of power authorizing less than 100 percent of property owners within a subdivision to adopt new restrictions respecting the use of privately owned property is valid, provided that such power is exer-

---

[7]At oral argument, Sandy Hook acknowledged that the trial court had not addressed, and it was not contending, that it had the authority to *amend* the Original Covenants. Thus, we limit our opinion to whether Sandy Hook is authorized to *adopt* new restrictions in the nature of restrictive covenants.

cised in a reasonable manner consistent with the general plan of the development.

Thus, the central issue in this case is whether the power to adopt such restrictions was expressly reserved to the Corporation. Sandy Hook contends that the "subject to" language, which is the last line in the plat dedication, constitutes an express reservation of power to the Corporation to adopt new restrictions respecting the use of *all* property within the plat. According to Sandy Hook, the relators expressly agreed to this reservation of power by virtue of having purchased property within the development subject to the restrictions contained within the plat dedication.

The relators, however, contend that the "subject to" language is ambiguous, arguing that it only modifies the language directly preceding it which relates to the Common Amenities. Accordingly, they argue that the reservation of power contained in the "subject to" language relates only to Sandy Hook's power to enact new restrictions relating to the commonly owned property, not privately owned property.

Both parties assume that the rules governing the interpretation of restrictive covenants, rather than the general rules governing contract interpretation, apply to the interpretation of the "subject to" provision.

A covenant is defined as:

[A]n agreement or promise of two or more parties that something is done, will be done, or will not be done. In modern usage, the term covenant generally describes promises relating to real property that are created in conveyances or other instruments.

(Footnotes omitted.) 5 Powell, *Real Property* ¶ 670[2].

■ Based on this definition, it is clear that the "subject to" provision is not a promise relating directly to real property. Rather, it is a provision that notifies interested parties that certain power has been reserved to the Corporation to adopt regulations, reservations, and restrictions. Because this reservation of power provision is not a restrictive covenant, we will apply the rules of contract interpretation.[8]

---

[8]Even if the rules governing the interpretation of restrictive covenants applied, we note that contrary to the relators' assertions, "[t]he clear trend in

■■ The purpose of contract interpretation is to ascertain the parties' intent. *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). To determine the parties' intent, Washington courts apply the "context rule" of contract interpretation, which allows a court, while viewing the contract as a whole, to consider extrinsic evidence, such as the circumstances leading to the execution of the contract, the subsequent conduct of the parties and the reasonableness of the parties' respective interpretations. *Berg*, at 667-69. The "context rule" applies even when the disputed provision is unambiguous. *Berg*, at 669.

■ A contract provision is ambiguous when its terms are uncertain or when its terms are capable of being understood as having more than one meaning. *See, e.g., White v. Wilhelm*, 34 Wn. App. 763, 771, 665 P.2d 407, *review denied*, 100 Wn.2d 1025 (1983). However, a provision is not ambiguous simply because the parties suggest opposing meanings. *James S. Black & Co. v. P&R Co.*, 12 Wn. App. 533, 535, 530 P.2d 722 (1975); *Boyles*, 517 N.W.2d at 615.

■ We find no ambiguity and conclude that the reservation of power in the "subject to" language was intended to apply to *all* property within the development. Although the "subject to" language itself does not expressly state that the reservation of power applies to all property within the plat, the Articles, which were expressly referenced in the reservation of power and which were prepared contemporaneously with the plat dedication, do evidence such an intent. *See Rodruck v. Sand Point Maintenance Comm'n*, 48 Wn.2d 565, 577, 295 P.2d 714 (1956) (in determining whether a covenant ran with the land, the court considered the articles of incorporation and bylaws to be "correlated documents" to the deed).

---

this country is in the direction of moderating the previous approach of strict construction of covenants. Rather than being disfavored as restraints on alienation, modern courts see them as being positive vehicles for the proper and ordered development of land." 1 Wash. State Bar Ass'n, *Real Property Deskbook* § 17.16, at 17-31 (2d ed. 1986); *see also Thayer v. Thompson*, 36 Wn. App. 794, 796-97, 677 P.2d 787, *review denied*, 101 Wn.2d 1016 (1984).

For instance, paragraph 16 of the Articles states that "[a]ll of the foregoing purposes and powers are to exercised . . . for the purposes of doing . . . the things above set forth for the benefit of *all property* situated in the plat of Sandy Hook Yacht Club Estates. . . ." (Italics ours.) In addition, paragraph 12 of the Articles states that the Corporation is empowered "to do any and all lawful things which may be . . . authorized . . . under or by virtue of any restrictions, conditions, and/or covenants . . . *affecting said property, or any portions thereof (including areas now and hereafter dedicated to public use). . . .*" (Italics ours.) The fact that paragraph 12 makes a distinction between the "said property", *i.e.*, privately owned property, and those areas dedicated to public use is strong evidence that the reservation of power was intended to apply to all plat property.

Moreover, the Corporation's subsequent conduct, in which it thrice adopted new restrictions applicable to privately owned property, is confirmation that the reservation of power was intended to apply to all plat property. In fact, the preface to the 1971 covenant changes expressly refers to the plat dedication, Articles, and Bylaws as the source from which the Corporation derived its power to adopt covenant changes respecting the use of privately owned property within the plat.

Finally, a review of the plat dedication, Articles, and Bylaws, which are "correlated documents", clearly indicate that Sandy Hook's developers intended to provide for a planned and uniform scheme of development that would be applicable to all lots. The relators admit as much by characterizing the Development as "an upscale, year-round, residential development with considerable focus on its waterfront recreational amenities". If the reservation of power was intended to apply only to the Common Amenities, such a reservation would be superfluous. Accordingly, Sandy Hook's interpretation that the reservation of power was intended to apply to all property within the plat is clearly the more reasonable one.[9]

---

[9]Because no ambiguity exists as to whether the reservation of power applies to all plat property, we need not resort to rules of contract construction, such as the

In light of the foregoing, we conclude that the power to adopt new restrictions respecting the use of privately owned land that bind all Sandy Hook property owners was expressly reserved to the Corporation. Under these circumstances where: (1) it is undisputed that the relators had notice of the reservation of power,[10] (2) it is undisputed that Sandy Hook followed the established procedures for adopting such restrictions and (3) it has not been alleged that the reservation of power or the particular restrictions at issue are void as against public policy, we hold that all Sandy Hook property owners are bound by the new restrictions respecting the use of privately owned property heretofore adopted by Sandy Hook.

Affirmed.

SCHOLFIELD and AGID, JJ., concur.

Review denied 127 Wn.2d 1003 (1995).

---

rule of ejusdem generis as the relators contend. *See Eurick v. Pemco Ins. Co.*, 108 Wn.2d 338, 340-41, 738 P.2d 251 (1987) ("rules of construction are not goals in themselves but only aids to interpretation; the goal is to give effect to the apparent clear intention of the parties.").

[10]Although the relators point out that the Articles and By laws were not filed with the Island County Auditor until December 26, 1972, they fail to show that this violated any legal requirement. Moreover, the parties stipulated that all Sandy Hook property owners purchased their lots after June 13, 1960, and that all Appellants "had constructive notice of the documents that were properly recorded with the Island County Auditor as of the date of purchase of their property."