
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| NOCHE VISTA, LLC, a Washington limited liability company, | ) ) ) | No. 36677-4-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| BANDERA AT BEAR MOUNTAIN RANCH HOMEOWNERS ASSOCIATION, a Washington Nonprofit Corporation, | ) ) ) ) ) | |
| Respondent. | ) ) | |

SIDDOWAY, J. — Noche Vista, LLC appeals the trial court's summary judgment

determination that property it acquired for development in 2013 was subject to covenants,

conditions and restrictions recorded by a prior owner in 2006. It also challenges the trial

court's refusal to consider declarations filed with a motion for reconsideration and its award of attorney fees and costs to the defendant homeowners association. We affirm.

FACTS AND PROCEDURAL BACKGROUND

In January 2013, John Dwyer "and or assigns" entered into a purchase and sale agreement with North Cascades National Bank to acquire approximately 31 acres of undeveloped property in Chelan County. Clerk's Papers (CP) at 393. The agreement described the property as "Tract 10 Bandera at Bear Mountain Ranch," less a portion of property that had been removed by a boundary line adjustment. CP at 394. The Bank had acquired the property the year before from Bear Mountain Ranch Holdings, LLC, through a deed in lieu of foreclosure. Before closing the purchase, Mr. Dwyer formed Noche Vista, LLC to become the owner of the property.

A preliminary commitment for title insurance from North Meridian Title and Escrow, LLC listed as special exceptions to title a "Declaration of Covenants, Conditions & Restrictions & Easements for Bandera at Bear Mountain Ranch" (Declaration) that had been recorded in January 2006 by Scofield Construction, LLC. CP at 166-203. "Bandera" and "Bandera at Bear Mountain Ranch" were undefined in the Declaration, but "Bandera Phases I and II" and "Bandera Phase III" were defined, and the property being acquired by Noche Vista was referred to as "Bandera Phase III." CP at 171-74. Six amendments to the Declaration were identified as additional exceptions to Noche Vista's title.

2

Mr. Dwyer reviewed the preliminary title commitment before closing and believed the Declaration encumbered title to the property he was acquiring, which we refer to hereafter as "Bandera Phase III," or "Phase III." He observed that Jerry Scofield, the principal of Scofield Construction, had identified Scofield Construction and its successors and assigns (hereafter collectively "Scofield"[1]) as both "Declarant" and "Management" in the Declaration, reserving considerable authority over property improvements. Mr. Dwyer believed that Scofield's control over development of earlier Bandera phases had hindered its growth and success and he wanted the Declaration amended to eliminate Scofield's control. At the request of Mr. Dwyer and his lawyer, the Bank's chief credit officer worked to get Scofield to execute a seventh amendment to the Declaration that would address Mr. Dwyer's concerns.

A seventh amendment was prepared that would replace preconstruction review and construction covenants in the Declaration and recognize Scofield's agreement to incorporate a homeowners association to which it would relinquish management control. In the course of communications about the seventh amendment, Mr. Dwyer stated in an e-mail to the bank credit officer that "we are on the right track with adding Phase III back

---

[1] Scofield Construction added Bear Mountain, LLC as an additional Declarant in a 2006 amendment to the Declaration. Both corporations later changed their names, with Scofield Construction becoming B.M.R. Construction and Development, and Bear Mountain becoming Bear Mountain Ranch Holdings.

to Addendum 7. As you mentioned I do want to be a good neighbor and fully intend to adhere to the CC&R." CP at 415.

On April 9, 2013, a lawyer representing the soon-to-be-incorporated Bandera at Bear Mountain Ranch Homeowners Association (the HOA) notified Mr. Dwyer's lawyer:

> I have confirmation from his attorney that Scofield has signed the 7th Amendment. However, it is unlikely that the Amendment will be recorded before the currently scheduled closing date. It seems that either an extension to the closing date, or an addendum acknowledging the pending "encumbrance" of the 7th Amendment should occur.
>
> I look forward to your thoughts.

CP at 425. Mr. Dwyer's lawyer responded, "My client would like to proceed with the closing on Friday. He would be satisfied with a copy of the signed agreement, plus confirmation that it has been submitted for recording." *Id.* The seventh amendment was recorded on April 12, 2013. Noche Vista acquired title by a deed recorded on April 15. The HOA was incorporated on April 18.

A couple of years into Noche Vista's ownership of Phase III, after Mr. Dwyer says he saw "how things worked (or, rather, didn't work) under the HOA's control," he consulted a second lawyer, asking that he "take a look at the Covenants to see if there was any relief from their Draconian requirements." CP at 644. In May 2015, the lawyer expressed his opinion that the original Declaration never encumbered the Phase III property. The lawyer also opined that the seventh amendment could not apply to Phase III because it was amended long after Scofield transferred all of its right, title and interest

4

in Phase III. According to Mr. Dwyer, it was only on consulting with this second lawyer that he learned that North Meridian Title's exceptions for the Declaration and its amendments was not a legal opinion, but only reflected a decision about the insurance risk it was willing to take on. In November 2015, Mr. Dwyer informed the HOA of his lawyer's conclusion that Phase III was not bound by the Declaration, forwarding a memorandum his lawyer prepared for that purpose. The HOA was not persuaded.

In April 2016, Noche Vista's new lawyer contacted a title officer for North Meridian with a request that it delete the special exception for the Declaration and its amendments from Noche Vista's final title report. After contacting its underwriter, the title officer declined the request. Mr. Dwyer also approached the HOA in 2016 about possible modifications to the covenants, conditions, and restrictions. Although representatives of the HOA met with Mr. Dwyer several times in 2016 and 2017 about proposed modifications, none were agreed.

In February 2018, Noche Vista brought this action against the HOA, seeking a declaratory judgment that Phase III is not subject to the Declaration and its amendments. In answering the complaint, the HOA not only disputed Noche Vista's construction of the Declaration but also contended that Noche Vista's request for a declaratory judgment was barred by estoppel, waiver, and laches. It sought its own declaratory judgment that Phase III was subject to the Declaration.

Several months later, Noche Vista and the HOA filed cross motions for summary judgment.

*Noche Vista's construction of the Declaration and amendments*

Noche Vista argued to the trial court that in the "Recitals" section of the Declaration it is "each Owner" who, by purchasing a lot, "agrees to commit to the vision of the Declarant and to abide by the intent and purpose of this Declaration." CP at 171. The defined term "Owner" means:

> one or more persons or entities who are, alone or collectively, the record owner of fee simple title to a Landholding, including Declarant, but does not include a person who only holds a Mortgage on a Landholding. Owner means the vendee, not the vendor, of a Landholding under a real estate contract.

CP at 179.

> The defined term "Landholding" means:

> one of the individual numbered lots, each approximately one-third acre in size, designated by Declarant to be a Landholding in Bandera as shown on the Plat. "Landholding" is not intended to include any lot or tract which is solely Common Use Area. The number of Landholdings may be increased through annexation of Bandera Phase III.

CP at 178-79.

"Plat" is defined to mean "Chelan County Plat No. P-2004-005," an eight-sheet plat filed for record on January 9, 2006. As shown by the simplified portion of sheet 2 of the plat that was included as the last page of the Declaration, and as borne out by sheets 3

and 4 of the plat, the only "individual numbered lots" designated in the plat were in

Bandera Phase I:



CP at 204 (partial).

Annexation was addressed by article 10 of the Declaration, which provides:

>    10.1    Annexation Approval.  During the Development Period
> additional real property may become annexed to and become subject to this
> Declaration by the recording of a supplemental (or amended) declaration
> executed by, or on its face approved by, the Declarant.
>
>    10.2    Effect of Annexation.  The recording of a supplemental
> declaration with the Chelan County Auditor will effectuate the annexation
> of the described real property.  The annexed property will be subject to this
> Declaration and the other Governing Documents.  The annexed property
> will be part of Bandera.  The supplemental declaration should incorporate
> by reference all of the covenants, conditions, restrictions, easements and
> other provisions of this Declaration, and may contain such complimentary
> additions or modifications of the covenants, conditions and restrictions in

this Declaration as may be reasonably necessary to reflect the different character, if any, of the annexed property as are not inconsistent with the plan of this Declaration.

CP at 198.

Noche Vista argued that the Declaration plainly provides that Phase III was not intended to be subject to the Declaration unless annexed, and it was never annexed.

*The HOA's construction of the Declaration and amendments*

The HOA advanced a different construction of the Declaration, but it led by arguing at the summary judgment hearing that "if the seventh amendment is a good amendment that Mr. Scofield had the ability to sign . . . the case is . . . over for Noche Vista." Report of Proceedings (RP) at 24. The seventh amendment contained a new article 2 that recognized Scofield was concurrently incorporating a homeowner's association to assume management of Bandera. Its first section, captioned "Purpose," states:

The Association shall be incorporated by the Declarant, or the Declarant's agent, for the purpose of managing the Common Use Areas located within Bandera Phases I, II, and III only, and common amenities such as common area landscaping, private road, curbs, entrance gates and other components shared by all Landholdings within Bandera Phases I, II and III, and enforcing the Declaration. The Association's management and enforcement authority shall be confined to Bandera Phases I, II and III.

CP at 308-09 (underlining omitted).

The amendment states that it modifies the Declaration "only as to that property described on the attached Exhibit 'A,'" and exhibit A includes Phases I, II and III

without qualification.  CP at 307 (underlining omitted).  Its section 7, captioned "Inconsistencies," states, "To the extent any other provision in the Declaration is inconsistent with the above provisions, the Declaration is hereby amended to eliminate such inconsistencies so as to be consistent with this Amendment."  CP at 317 (under-lining omitted).

The HOA argued that Scofield's 2012 transfer of its right, title and interest in Phase III did not divest it of its right to amend the Declaration because the right to amend was not predicated on ownership of Phase III.  It was predicated instead on the fact that Scofield was authorized by the 2006 Declaration to make the amendment, and Phase III was encumbered by the Declaration.

Turning to the Declaration, the HOA emphasized the need to construe it as a whole, and in favor of protecting Scofield's intent and the homeowners' collective interests, citing *Wilkinson v. Chiwawa Communities Ass'n*, 180 Wn.2d 241, 250, 327 P.3d 614 (2014).  It pointed out that the Declaration includes the legal description for the 92.9 acres comprising all three phases of Bandera.  The Declaration begins by noting that it is being made by the owner and developer "of certain real property . . . commonly known as Bandera at Bear Mountain Ranch, which property is more specifically described herein."  CP at 171.

The Declaration recites:

> Declarant's intent and vision is to impose covenants, conditions, restrictions and easements on Bandera which will create a planned community development and provide for its overall maintenance and preservation. This Declaration is intended to provide a set of standards consistent with the vision of the Declarant, which is to maintain Bandera in its natural state as much as reasonably possible.

CP at 171.

The HOA also pointed to section 12.4, captioned "Binding," which speaks of "persons," not Owners, "bind[ing] themselves and their heirs, personal representatives, successors, transferees and assigns to all of the provisions now or hereafter imposed by this Declaration or other Governing Documents and any amendments thereto." CP at 200 (underlining omitted).

The trial court rejected the HOA's arguments based on the seventh amendment, finding that it presented issues of disputed fact. It was persuaded that the plain language of the Declaration supported the HOA's position and granted its cross motion for summary judgment, denying Noche Vista's motion.

Noche Vista filed a timely motion for reconsideration supported by the declarations of two individuals who had worked on aspects of the Bandera development for Jerry Schofield prior to 2006. (Mr. Scofield had died in 2014.) According to the declarations, Scofield had been exploring development options for Phase III that would not have complied with restrictions contained in the Declaration. Noche Vista argued that this explained why Phase III was excluded from the operation of the covenants,

conditions, and restrictions unless and until it was annexed. The trial court entertained argument of the motion but denied it, stating it was electing not to consider the new declarations.

Noche Vista appealed. After the trial court awarded attorney fees to the HOA, Noche Vista filed a motion for reconsideration of the fee award. It too was denied. Noche Vista amended its notice of appeal to challenge that reconsideration decision as well.

## ANALYSIS

Noche Vista appeals the trial court's order granting and denying summary judgment, its refusal to consider the declarations filed in support of its motion for reconsideration, and the trial court's award of the HOA's attorney fees. We address the issues in the order presented.

I. SUMMARY JUDGMENT WAS PROPER, ALBEIT ON A GROUND REJECTED BY THE TRIAL COURT BUT SUPPORTED BY THE RECORD

We review an order on cross motions for summary judgment de novo, engaging in the same inquiry as the trial court. *Wilkinson*, 180 Wn.2d at 249. Summary judgment is appropriate when there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). We may affirm a trial court's disposition of a motion for summary judgment on any ground supported by the record. *Washburn v. City of Fed. Way*, 178 Wn.2d 732, 753 n.9, 310 P.3d 1275 (2013)

(citing *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 344, 883 P.2d 1383 (1994); *Rawlins v. Nelson*, 38 Wn.2d 570, 578, 231 P.2d 281 (1951)).

The court's primary objective in interpreting restrictive covenants is to determine the intent of the parties. *Riss v. Angel*, 131 Wn.2d 612, 621, 934 P.2d 669 (1997). The relevant intent, or purposes, is that of those establishing the covenants. *Id.* (citing ROBERT G. NATELSON, LAW OF PROPERTY OWNERS ASSOCIATIONS § 2.5, at 61 (1989)). The drafter's intent is a question of fact. *Wilkinson*, 180 Wn.2d at 250. We apply the rules of contract interpretation. *Id.* at 249.

We examine the language of the restrictive covenant and consider the instrument in its entirety. *Id.* at 250 (citing *Hollis v. Garwell, Inc.*, 137 Wn.2d 683, 694, 974 P.2d 836 (1999)). "'An interpretation which gives effect to all of the words in a contract provision is favored over one which renders some of the language meaningless or ineffective.'" *GMAC v. Everett Chevrolet, Inc.*, 179 Wn. App. 126, 135, 317 P.3d 1074 (2014) (quoting *Seattle-First Nat'l Bank v. Westlake Park Assocs.*, 42 Wn. App. 269, 274, 711 P.2d 361 (1985)).

Extrinsic evidence will be used to illuminate what was written, but not if it would vary, contradict, or modify the written word or show an intention independent of the instrument. *Wilkinson*, 180 Wn.2d at 251 (citing *Hollis*, 137 Wn.2d at 697). Such evidence "includes 'the circumstances leading to the execution of the contract, the subsequent conduct of the parties and the reasonableness of the parties' respective

12

interpretations.'"  *Id.* at 269 (Madsen, C.J., dissenting) (quoting *Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc.*, 76 Wn. App. 267, 275, 883 P.2d 1387 (1994)).

Restrictive covenants are enforceable promises relating to the use of land.  *Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 119, 118 P.3d 322 (2005).  As pointed out by the *Restatement (Third) of Property*:

> There is a wide diversity in the types of land-use arrangements that can be implemented by servitudes.  Depending on the nature and object of the arrangement, the parties may create servitudes whose benefits will be held personally, in gross, or appurtenant to another interest in land. . . .  In determining what the parties intended, the full range of possibilities should be kept in mind.

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 2.6, cmt. c (AM. LAW INST. 2000).

*Applying these principles to the Declaration*

We agree with Noche Vista that we cannot treat as meaningless the statement in section 1.15's definition of "Landholding" that "The number of Landholdings may be increased through annexation of Bandera Phase III."  CP at 179.  The definition of Landholding is critical to the definition of "Owner," and a number of provisions of the Declaration apply only to Owners.  It is clear from that statement in section 1.15 and from the separately defined terms "Bandera Phases I and II" and "Bandera Phase III" that lots in Phase III could only become *fully* subject to the Declaration—subject to provisions applicable only to Owners—following annexation.

13

By the same token, we cannot treat as meaningless Scofield's inclusion of Phase III in the Declaration, particularly where the statement that Landholdings "*may* be increased through annexation of Bandera Phase III" (emphasis added) is most reasonably understood as binding future owners of and within Phase III to being annexed in the manner provided by the Declaration. *Black's Law Dictionary* at 1172-73 (11th ed. 2019) provides the following definition of "may":

> **1.** To be permitted to <the plaintiff may close>. **2.** To be a possibility <we may win on appeal>. Cf. CAN. **3.** Loosely, is required to; shall; must <if two or more defendants are jointly indicted, any defendant who so requests may be tried separately>.

There would be no point in including Bandera Phase III in the Declaration if only to say that there was a "possibility" it could be annexed.

> Noche Vista argues that including Phase III in the Declaration
>
> creat[ed] a placeholder for Phase III to potentially become part of the community with an annexation process . . . creat[ing] a pre-existing framework that would apply to Phase III without the need for future negotiations.

Br. of Appellant at 19. But article 10, dealing with annexation, suffices for that purpose. Including Phase III in the Declaration and binding it to the Declaration's terms[2] is meaningful only because it binds Phase III to a method of annexation.

---

[2]The Declaration clearly binds Phase III to something. Among other provisions, it states in section 12.4:

> Declarant, for itself, its successors and assigns hereby declares that *all of Bandera* must be held, used and occupied subject to the conditions,

14

The Declaration provides that annexation is accomplished by an amendment executed by the declarant. Decl., Section 10.1; CP at 198. The "Declarant" is Scofield. Decl., Section 1.9; CP at 178. Until the end of the development period (defined as 35 years from the date of recording the Declaration, unless earlier terminated by the declarant in writing) the declarant was granted "the absolute right and sole discretion" to amend the Declaration, subject to its express limitations and a requirement to exercise the discretion reasonably, in a manner that would not impair marketability of title or the security of any mortgage. Decl., Section 9.2; CP at 198. Elsewhere, the Declaration provides that

> [f]or the purpose of this Declaration and the easements, dedications, rights, privileges and reservations set forth herein, a successor and assign of Declarant is deemed a successor Declarant and assign only to the extent specifically designated by Declarant and only with respect to the particular rights and interests specifically designated.

Section 12.13; CP at 202.

Jerry Scofield presumably expected his vision to succeed and might not have foreseen losing a portion of Bandera to foreclosure—although perhaps he did. Surely, however, he could have foreseen a possible future need to sell equity in Scofield in order to raise capital for his ambitious development plan. By binding Phase III in the

---

> covenants and restrictions of this Declaration and the other Governing Documents, and that all such provisions will run with the land and be binding upon all persons who hereafter become the owner of *any interest in Bandera.*

CP at 200-01 (emphasis added).

15

Declaration to the annexation provision, he could ensure for himself (and for the Owners of lots in Phases I and II) that annexing Phase III was within his control. This is consistent with Noche Vista's evidence and argument that Scofield wanted maximum flexibility. Including Phase III in the Declaration was not merely a "placeholder" for future annexation as argued by Noche Vista; it ensured that whatever happened to ownership of Phase III, Scofield would have the power to annex it.

To summarize, the Declaration is reasonably understood to create one set of servitudes for "Owners," as defined, and a different servitude for Phase III: permission for the Declarant to annex it by amending the Declaration.

Annexation of Phase III was accomplished by the execution and recording of the seventh amendment. Annexation could be by an amended declaration, and the seventh amendment was "made by the Declarant . . . pursuant to Article 9, Section 9.2 of the Declaration," its "Amendment" provision. CP at 306. The amendment was made "prior to the end of the Development Period." CP at 317. It modified the Declaration "as to that property described on the attached Exhibit 'A,'" which included Phase III. CP at 307. It provided that the HOA, which was being incorporated simultaneously, would manage the common areas and amenities and enforce the Declaration as to "Bandera Phases I, II and III." CP at 308-09. It amended the Declaration to "eliminate [any] inconsistencies." CP at 317.

16

Noche Vista argues on appeal that the seventh amendment failed to modify the definition of Landholdings or the annexation procedure. But it did not need to. It effected annexation. The definition of Landholdings recognized that Landholdings were "increased through annexation." Decl., Section 1.15; CP at 31-32.

In the trial court, Noche Vista argued that the seventh amendment was ineffective because "a person may only encumber real property which he or she owns or in which he or she has rights," and "when Scofield executed the Seventh Amendment neither he nor any of his entities had an ownership interest" in Phase III. CP at 526. But when Scofield signed the seventh amendment, it was not encumbering Phase III. Phase III was encumbered in 2006, with the execution and recording of the Declaration. Scofield owned Phase III then. With the seventh amendment, Scofield merely exercised its authority under the Declaration to annex it by amendment.

Noche Vista made a related argument in the trial court that Scofield conveyed away its right as declarant to annex Phase III in its deed in lieu of foreclosure. But the deed conveyed Scofield's "right, title, and interest in and to the following described real estate," CP at 381, and Noche Vista cites no authority for the proposition that a declarant's right to annex real estate is itself part of that real estate. "The general rule" in jurisdictions addressing the issue is that "the developer's rights are personal rights and do not run with the land." *Scott v. Ranch Roy-L, Inc.*, 182 S.W.3d 627, 633 (Mo. Ct. App. 2005); *accord Fairways of Country Lakes Townhouse Ass'n v. Shenandoah Dev. Corp.*,

17

113 Ill. App. 3d 932, 447 N.E.2d 1367, 69 Ill. Dec. 680 (1983); *Peoples Fed. Sav. & Loan Ass'n of S.C. v. Res. Planning Corp.*, 358 S.C. 460, 596 S.E.2d 51, 60-61 (2004); *Larkin v. City of Burlington*, 172 Vt. 566, 772 A.2d 553 (2001); *Diamondhead Country Club & Prop. Owners Ass'n, Inc. v. Peoples Bank*, No. 2018-CA-00978-SCT, 2020 WL 948324, at *4 (Miss. Feb. 27, 2020).

Viewed differently but with the same result, by virtue of the Declaration, the owners of property in Phases I and II also had an interest in Scofield's authority to annex Phase III—as evidenced by the HOA's position in this action. The Declaration did not provide that Scofield's authority to annex would be lost if it executed a property conveyance.

Extrinsic evidence in the form of the conduct of the parties strongly supports construing the Declaration as permitting annexation of Phase III in the manner effectuated by the seventh amendment. Mr. Dwyer knew he took title subject to a servitude and that the seventh amendment would accomplish annexation. In order to avoid other control he believed Scofield had over preconstruction review and construction in Phase III, he actively sought an amendment to the Declaration that would substitute an HOA and other design review and building covenants. He understood that it would "add[ ] Phase III back" and require Noche Vista to "adhere to the CC&R." CP at 415.

18

Noche Vista's remaining arguments do not undercut this plain meaning of the Declaration. It points out that while the abbreviated legal description and assessor's tax parcel identification on the first page of the Declaration include all three phases of Bandera, the citation to the "Additional legal" is to only "pages 1, 2 and 3": the legal description of Phases I and II. CP at 166, 171-73. Under RCW 65.04.045(1)(f), which governs the form of recorded instrument that county auditors must require, the first page or a cover page is to include a "reference to the document page number where the full legal description [of the property] is included, if applicable." An erroneous reference in the first page's summary information cannot alter the meaning of the Declaration. But the page number reference is arguably evidence of the property the recording party intends to subject to the recorded document. The problem for Noche Vista, however, is that the summary information on the first page of every amendment to the Declaration referred to an exhibit that contained the legal description of Phases I, II and III. If we treat the lawyers' preparation of summary information on recorded documents as evidence of intent, there is seven times more evidence of an intent to include Phase III than there is evidence to exclude it.

Finally, Noche Vista argues that its construction of the Declaration is supported by its "Future Development" provision, which warns purchasers that "areas of Bear Mountain Ranch will continue to be developed for residential use, for higher density occupation or for any other purpose permitted by law." CP at 192 (underline omitted). It

argues that this conveyed to purchasers that Phase III was not subject to the Declaration's restrictions. What the provision conveys, however, is that the entire 1,500 acre planned development district "Bear Mountain Ranch" (a defined term), within which Bandera is located, is not subject to the Declaration's restrictions. It would have been a simple matter for the Declaration to say that "areas of *Phase III* will continue to be developed for residential use, for higher density occupation or for any other purpose permitted by law," if that was what was intended. The Future Development provision does not say that.

Since the Declaration plainly authorized the annexation effectuated by the seventh amendment, it was proper to grant summary judgment in the HOA's favor.

II.    REFUSAL TO CONSIDER THE DECLARATIONS SUPPORTING THE MOTION FOR RECONSIDERATION WAS HARMLESS

Noche Vista argues the trial court erred when it declined to consider the two declarations it submitted with its motion for reconsideration. "The decision to consider new or additional evidence presented with a motion for reconsideration is squarely within the trial court's discretion." *Martini v. Post*, 178 Wn. App. 153, 162, 313 P.3d 473 (2013). The trial court's discretion extends to refusing to consider an argument raised for the first time on reconsideration absent a good excuse. *River House Dev. Inc. v. Integrus Architecture, P.S.*, 167 Wn. App. 221, 231, 272 P.3d 289 (2012). We review a trial court's denial of a motion for reconsideration for abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Id.*

20

Assuming without deciding that the trial court abused its discretion, given the basis of our decision, the refusal to consider the declarations was harmless. The declarations and Noche Vista's argument from the declarations that Scofield wanted flexibility for Phase III are consistent with the basis on which we affirm the summary judgment decision.

III.     THE ATTORNEY FEE PROVISION APPLIED

Finally, Noche Vista argues that the trial court erred in awarding the HOA its reasonable attorney fees and costs because the Declaration's fee provision does not apply to this type of dispute and alternatively, because the HOA was not a substantially prevailing party.

"Whether a contract or statute authorizes an award of attorney fees is . . . a question of law reviewed de novo." *Torgerson v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 517, 210 P.3d 318 (2009). The Declaration's fee provision appears in section 12.16, and provides:

> In the event any party employs legal counsel to enforce any covenant of this lease, [sic] or to pursue any other remedy on default as provided herein, or by law, the substantially prevailing party shall be entitled to recover all reasonable attorneys' fees, appraisal fees, title search fees, other necessary expert witness fees and all other costs and expenses not limited to court action. Such sum shall be included in any judgment or decree entered.

CP at 202. Noche Vista asserts "[t]he covenants govern only the design, construction, and maintenance of improvements an Owner makes to a Landholding." Br. of Appellant

21

at 44. It does not explain why it perceives this limitation on the meaning of "any covenant."

*Black's Law Dictionary*, at 457 (11th ed. 2019), defines "covenant" as "[a] formal agreement or promise, usu. in a contract or deed, to do or not do a particular act; a compact or stipulation." This court has described "covenant" as "'[a]n agreement or promise of two or more parties that something is done, will be done, or will not be done. In modern usage, the term covenant generally describes promises relating to real property that are created in conveyances or other instruments.'" *Shafer*, 76 Wn. App. at 274 (quoting 9 MICHAEL ALLAN WOLF, POWELL ON REAL PROPERTY § 60.01[2]). Noche Vista's complaint sought "a Declaratory Judgment that Plaintiff's Property is not subject to the Covenants." CP at 8. The HOA counterclaimed for a declaratory judgment "that Plaintiff's property is subject to the Covenants." CP at 126.

In *Roats v. Blakely Island Maintenance Commission, Inc.*, 169 Wn. App. 263, 285, 279 P.3d 943 (2012), this court construed a much narrower attorney fee provision in the bylaws of a homeowner's association, which provided for payments of assessments to the association and that "the amount of each assessment and the amount of any other delinquent assessments, *together with all expenses, attorney's fees and costs reasonably incurred in enforcing same* shall be paid by the member." The Roatses, members of the homeowner's association, refused to pay a portion of an assessment and, after the association threatened to file a lien against their property, they filed litigation seeking

injunctive relief and an order quieting title. When they lost, they objected to an award of attorney fees to the homeowners' association because it had not brought a collection action to enforce an assessment. This court recognized that there was more than one way to "enforce" delinquent assessments, and one way was by threatening the lien that caused the Roatses to file a lawsuit.

Similarly here, seeking a declaration that Noche Vista was subject to the covenants contained in the Declaration was a means of enforcing the covenants. The trial court did not err by granting a fee award.

Noche Vista also argues that the HOA was not a substantially prevailing party because "[*b*]*oth* the HOA and Noche Vista prevailed on key aspects of the case." Br. of Appellant at 47. In the trial court, it based this argument on a contention that the validity of the seventh amendment was a "major component" of the HOA's defense theory on which the HOA failed to prevail. Our conclusion that the seventh amendment is critical to the HOA's entitlement to summary judgment guts this alternative challenge to the fee award.

IV. FEES ON APPEAL

Both parties argue that if they prevail, they are entitled to an award of attorney fees on appeal under RAP 18.1 and section 12.16 of the Declaration. Noche Vista challenges the HOA's right to recover fees on appeal based on its argument that this was not an action to enforce a covenant, but we have rejected that argument. We award the

HOA its reasonable attorney fees and costs on appeal subject to its timely compliance with RAP 18.1(d).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Pennell, C.J.

_____
Korsmo, J.

24