IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| SUROWIECKI FAMILY LP II, | ) | No. 79775-1-I |
| | ) | |
| Appellant, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| HAT ISLAND COMMUNITY | ) | |
| ASSOCIATION, a Washington nonprofit | ) | |
| corporation, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

ANDRUS, A.C.J. – Surowiecki Family LP II, an entity owned by Matthew Surowiecki, Sr., is a member of the Hat Island Community Association (HICA) because it owns lots within Division J of Hat Island, a private island located near Everett, Washington. Surowiecki and HICA have been litigating for years over the association's uniform, per lot assessment structure. In 2018, Surowiecki Family LP II initiated this action seeking to enforce an amendment, passed by Surowiecki as the owner of a majority of lots, to Division J's restrictive covenants purporting to modify the assessment structure for that division (Division J Amendment). The trial court invalidated the Division J Amendment on summary judgment, and Surowiecki appeals. We affirm because the Division J Amendment is inconsistent with the general plan of development for lots owned by HICA members.

Citations and pin cites are based on the Westlaw online version of the cited material.

## FACTS

Hat Island is a private island west of Everett in Snohomish County (Island). Of the Island's 974 lots, there are 928 lots subject to the jurisdiction of the Hat Island Community Association (HICA).[1]  The lots governed by HICA are grouped into 19 divisions,[2] with the plats for each recorded over time.  Division J, platted in 1964, contains 101 lots.  Matthew Surowiecki purchased 51 of the 101 lots within Division J in his capacity as owner or manager of Surowiecki Family LP II and dozens of other entities.[3]

All lots within Divisions A through H, and J, K, M, and N are subject to a set of identical recorded covenants, entitled "Restrictive Covenants Running with Land and Easements" (RC&Es).[4]  An entity known as the Hat Island Development Company (Company) originally recorded the RC&Es against each division, including Division J.  Under these covenants, the Company agreed to construct roads and to develop a water supply, golf course, and electrical system on the Island.  Section 21 of the RC&Es grants an easement to lot owners to use the roads for ingress and egress.

The Company subsequently conveyed title to the roads and the other developed amenities to Hat Island Country Club, the predecessor to HICA, and the

---

[1] HICA was formerly known as the Hat Island Country Club.  Although this occurred at some point between 1967 and 2010, it is unclear from this record when that re-naming occurred.

[2] These divisions are: A, B, C, D, E, F, G, H, J, K, M, N, and P, as well as S, U, V, W, and X.  There are two additional divisions: Gedney Island Beach Tracts Div. 1 and 2, also known as Divisions T and R.  These divisions are not subject to membership in HICA or under HICA's control.

[3] Surowiecki purchased 48 of the lots on Division J in his capacity as managing member or owner several limited liability companies (LLCs).  Three of the lots were also purchased by Steeler, Inc., another entity controlled by Surowiecki.  HICA presented evidence that the majority of Surowiecki's companies were dissolved in March 2009, and only Steeler, Inc. and Surowiecki Family LP II remain active with the Washington Secretary of State.

[4] Division I is apparently not platted.

club became responsible for assessing its members for the cost of operating and maintaining the roads and amenities:

> There shall be easements for roads for ingress and egress and for utilities for all lot owners of the said plat on all roads as shown on the plat referred to above, as well as on any plat or plats hereafter recorded by the grantors covering property located on Hat Island, also known as Gedney Island, Snohomish County, Washington. The Hat Island Development Company shall construct all roads shown on said plat or plats, develop water supply, develop and construct a golf course and, if feasible, an air strip, and shall provide electric service and maintain said facilities until some are conveyed to Hat Island Country Club, Inc. Thereafter, said club shall maintain and operate said facilities together with such additional recreational or other facilities as it shall by proper authorization from its membership undertake to provide. The said Club shall have the power to charge and assess its members on an equitable basis for such additional recreational or other facilities as shall be duly authorized by its membership for the mutual benefit of all its members. . . .

(Emphasis added). Section 21 does not define the phrase "an equitable basis."

Now, HICA owns and maintains the Island's roads, golf course, marina, ferry, and water treatment and distribution facility. All HICA members, regardless of whether they live on the Island full-time, have access to all HICA amenities, including an easement over its roads. Article I, Section 2 of HICA's bylaws gives it the authority to "levy and collect assessments against its members" to operate and maintain these amenities.

HICA has historically levied annual operating assessments on a uniform, per lot basis. Surowiecki has objected to this assessment structure, arguing that a uniform, per lot assessment is not an equitable method of allocating operational costs because some of the lots are undeveloped and unbuildable, lacking access to water or power, while other waterfront lots contain large homes.

- 3 -

On September 20, 2018, Surowiecki, claiming a majority of Division J lot owners had voted to modify Section 21 of the RC&Es governing that division, recorded a document entitled "Amendment to Restrictive Covenants Running with the Land and Easements for the Plat of Hat Island, Division 'J'." The Division J Amendment added the following language to Section 21:

> For purposes of these Covenants, the club's assessment of its members on an equitable basis shall be determined for each lot within Division J as follows: Each lot shall be assessed a pro rata share of the total charges and assessments for all lots in Division J (excluding usage fees) in accordance with that lot's tax assessed value divided by the tax assessed value of all lots in Division J. Tax assessed values shall be determined based on Snohomish County Assessor's records, including both the value of the land and improvements thereon, for the year prior to the year in which the assessments are ratified.

In effect, Surowiecki changed HICA's assessment structure from the uniform, per lot method to a method based on the tax assessed value of the lots, but only for lots within Division J. The Division J Amendment, if valid, would redistribute assessments to decrease Surowiecki's liability, on average, from $1,200 per lot to an average of $300 per lot. But for the owners of the 13 developed lots in Division J, their estimated assessments would increase, on average from $1,200 per lot to $7,393 per lot.

Surowiecki relied on Section 16 of the RC&Es as the basis for the modification. Section 16 provides:

> These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of thirty years from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of ten years <u>unless an instrument signed by a majority of the then-owners of the lots has been recorded, agreeing to change said covenants in whole or in part</u>.

(Emphasis added).

HICA, through its counsel, notified Surowiecki and the other HICA members that the Division J Amendment was "void, unenforceable and/or does not alter HICA's assessment authority or the obligations of Division J owners."

Surowiecki filed this declaratory judgment action seeking a judicial determination that the Division J Amendment is valid. On March 1, 2019, the parties filed cross motions for summary judgment, the sole issue of which was whether a majority of Division J owners could change HICA's assessment structure for their lots. On March 29, 2019, the trial court granted HICA's motion for summary judgment, holding that the Division J Amendment was invalid, and denied Surowiecki's cross motion. Surowiecki appeals.

<u>ANALYSIS</u>

Surowiecki contends the trial court erred in invalidating the Division J Amendment. This court reviews cross motions on summary judgment and the legal validity of restrictive covenants de novo. Wilkinson v. Chiwawa Communities Ass'n, 180 Wn.2d 241, 249, 327 P.3d 614 (2014).

Surowiecki raises two arguments on appeal. First, he maintains that Section 16 authorized the lot owners to amend Section 21 through a majority vote. Second, he contends the amendment relates to an existing covenant and is consistent with the general plan of development for Division J under the test set out in Wilkinson. HICA argues that Section 21 is not a "covenant" subject to modification under Section 16 and that the amendment is contrary to the general

plan of development on Hat Island. We conclude HICA has the more persuasive argument here.

We will assume, without deciding, that Section 21's provision relating to HICA's authority to levy equitable assessments is a "covenant" subject to amendment by Section 16 of the RC&Es. In Washington, however, "the authority of a simple majority of homeowners to adopt new covenants or amend existing ones in order to place new restrictions on the use of private property is limited." Wilkinson, 180 Wn.2d at 255-56. When the covenants authorize the creation of new restrictions that are unrelated to existing ones, "majority rule prevails 'provided that such power is exercised in a reasonable manner consistent with the general plan of the development.'" Id. at 256 (quoting Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc., 76 Wn. App. 267, 273-74, 883 P.2d 1387 (1994)). But "when the general plan of development permits a majority to change the covenants but not create new ones, a simple majority cannot add new restrictive covenants that are inconsistent with the general plan of development or have no relation to existing covenants." Id.; see also Ebel v. Fairwood Park II Homeowners' Ass'n, 136 Wn. App. 787, 793, 150 P.3d 1163 (2007) (amendment to covenant "may not create a new covenant that has no relation to the existing covenants"). "This rule protects the reasonable, settled expectation of landowners by giving them the power to block new covenants which have no relation to existing ones and deprive them of their property rights." Id. at 256 (internal quotation marks omitted) (quoting Meresse v. Stelma, 100 Wn. App. 857, 866, 999 P.2d 1267 (2000)).

Under <u>Wilkinson</u>, the first question is whether the RC&Es granted Division J lot owners the power to adopt new covenants unrelated to any existing ones or simply to make changes to pre-existing covenants. 180 Wn.2d at 255-56. If Division J owners only have the power to change existing covenants, the second question is whether the change relates to an existing covenant and whether it is consistent with HICA's general plan of development. <u>Id.</u> at 256.

We conclude Section 16 does not permit lot owners to create new restrictive covenants, but it allows them to modify existing ones. Interpreting restrictive covenants is a question of law, and we employ rules of contract interpretation to determine the drafter's intent, which is a question of fact. <u>Id.</u> at 249-50. In determining the drafter's intent, we give covenant language its ordinary and common use and will not construe a term in such a way so as to defeat its plain and obvious meaning. <u>Id</u>. at 250-51.

Here, Section 16 of the RC&Es provides that the "covenants shall be automatically extended for successive periods of ten years unless an instrument signed by majority of the then-owners of the lots has been recorded, <u>agreeing to change said covenants in whole or in part.</u>" (Emphasis added). To "change" means "to make different . . . to make different in some particular but short of conversion into something else." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 373 (2002). In <u>Wilkinson</u>, the restrictive covenants at issue similarly authorized a majority of owners "to change these protective restrictions and covenants in whole or in part." 180 Wn.2d at 256. The court held that this language allowed amendments but not the imposition of new restrictive covenants.

Id. The language of Section 16, which is identical to the language at issue in Wilkinson, is thus an authorization to modify existing covenants, but it does not permit a majority of owners to adopt completely new ones.

Surowiecki contends the Division J Amendment did not create a new covenant but merely defined the phrase "equitable basis," an otherwise undefined term within that section, and thus relates to the existing covenant relating to the levying of assessments. There may be circumstances in which adding definitional language to a pre-existing covenant does not create a new covenant. But we cannot agree with Surowiecki that his amendment falls into this category.

Section 21 gives HICA the power to impose assessments on its members in a manner it determines to be equitable; the Division J Amendment takes that power away from HICA. Article VIII, Section 1 of HICA's bylaws requires its board of trustees to "annually determine the proposed amount for the annual operating assessment against each and every lot for the subsequent year." (Emphasis added). The amendment not only diminishes HICA's authority as set out in Section 21, but it is a radical departure from HICA's historic practice. HICA—through its board of trustees and a vote of its entire membership—has always determined what an "equitable" assessment would be for its members. Although HICA could do so, it has never delegated that authority to each division to make that decision for itself and its lot owners. And the amendment significantly increases the liability of a minority of the lot owners in Division J without any evidence they consented to this change.

Division Two's decision in Meresse v. Stelma, 100 Wn. App. 857, 999 P.2d 1267 (2000) is instructive here. In that case, a majority of homeowners in a road association voted to amend the road maintenance agreement to change the location of the road and to require lot owners to maintain a 20-foot scenic easement on each side of the road. Id. at 862. The court invalidated the amendment because it was an "unexpected expansion of the subdivision owners' obligations to share in road maintenance." Id. at 866. As the Supreme Court explained in Wilkinson, the Meresse court determined the amendment was not sufficiently related to the existing road maintenance covenant because it "[did] not place a purchaser or owner on notice that he or she might be burdened, without assent, by road relocation at the majority's whim, especially in light of the apparent permanence of the road in its long-standing, existing location." Id. at 867.

As in Meresse, we conclude the Division J Amendment is not sufficiently related to the existing covenants because nothing in the RC&Es put owners on notice that they may be burdened, without their assent, to such a significant change in annual assessments without the approval of HICA and its members.

Even if the Division J Amendment related to the assessment covenant, we nevertheless conclude it is invalid because it does not conform to HICA's general plan of development. HICA's bylaws and the RC&Es evidence a general plan of development that grants HICA the authority to determine what assessment structure is "equitable" for each lot—not for each division. The undisputed evidence demonstrates that the owners of all lots in Divisions A through H, J, M and N are members of HICA. Article VIII, Section 1 of HICA's bylaws requires its

board of trustees to "annually determine the proposed amount of the annual operating assessment against each and every lot for the subsequent year." (Emphasis added). To make this determination, the board evaluates the total estimated operating expenses and the total estimated income from use-based fees charged in the form of green fees for the golf course, moorage fees at its marina, fees for water use, annual water hook-up fees, and ferry ticket sales. According to HICA, the annual assessments cover approximately half of HICA's expenses. After estimating the use-based fees HICA is likely to receive in the subsequent year, it evaluates the anticipated income from annual operating assessments levied against each lot.

The board is then required to present the budget to the association members for ratification. If the budget proposes an increase in annual operating assessments, then a vote of the ownership is required. If the members do not approve an assessment increase, then the previous year's assessment amount continues. Members are liable for the payment of any assessments "applicable to their respective lots." Any unpaid assessment constitutes a lien on the lot in the amount levied by HICA.

The Division J Amendment conflicts with this assessment structure and cannot be harmonized with it. First, the Division J Amendment delegates authority to a majority of lot owners in each division to determine what is an "equitable" assessment, thus removing that authority from HICA, as otherwise contemplated by Section 21 and HICA's bylaws. Second, the amendment mandates that the assessments in Division J, unlike any other division on Hat Island, be levied in

- 10 -

proportion to each lot's tax assessed value, even if a majority within HICA deemed that structure inequitable. Both aspects of the amendment are inconsistent with HICA's general plan of development.

Because we conclude that the Division J Amendment is unrelated to an existing covenant and does not conform to HICA's general plan of development, it is invalid under Washington law. The trial court did not err in granting summary judgment to HICA.

Affirmed.

_Andrus, A.C.J._

WE CONCUR:

_Chun, J._                    _Appelwick, J._